SCHAGHTICOKE INDIANS OF KENT, CONNECTICUT, INC.,
ET AL. *v.* KEITH POTTER ET AL.
(7919)

BORDEN, FOTI and LAVERY, Js.

Argued November 2, 1989—decision released May 16, 1990

*Grace M. Dodier,* assistant attorney general, with whom, on the brief, were *Clarine Nardi Riddle,* attorney general, and *Robert E. Walsh,* assistant attorney general, for the appellees (intervening plaintiffs).

LAVERY, J. This case arises from a contract action that the plaintiff, the Schaghticoke Indians of Kent, Connecticut, Inc. (the Schaghticoke Indians), instituted against the defendants Keith Potter and Alan Russell. The complaint alleged that a contract for the sale of timber between Potter, an independent logger, and

Russell, a member of the Schaghticoke Indians, had resulted in substantial damage to the Schaghticoke tribal reservation. After commencement of the suit, the state of Connecticut and the commissioner of environmental protection (the state) received permission to intervene as plaintiffs. Thereafter, the defendant Russell moved to dismiss the action, arguing that the Superior Court lacked civil jurisdiction over an Indian tribal dispute. The trial court granted the motion and, in its memorandum of decision, characterized the dispute as concerning whether Russell is actually the tribal chief, with authority to enter into contracts on behalf of the tribe. The tribe, however, does not deny in its complaint that Russell is the tribal chief. The tribe alleges only that, as chief, Russell failed to obtain the consent and approval of the tribal counsel before entering into the contract with the defendant, Potter. The tribe alleges that the defendants acted in concert in deforesting the tribe's reservation. The state has brought this appeal. Neither the original plaintiff, the Schaghticoke Indians, nor the defendants here have joined in the appeal, filed a brief or appeared at argument.

The disposition of this appeal depends on whether the state has a sufficient interest in the outcome of the case to entitle it to bring an appeal in the absence of the Schaghticoke Indians. In *Diamond* v. *Charles,* 476 U.S. 54, 68, 106 S. Ct. 1697, 90 L. Ed. 2d 48 (1986), the United States Supreme Court held that an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he or she has standing. Under Connecticut law, a party may not appeal from the final judgment of a court unless that party is aggrieved. Practice Book § 4000; *Nye* v. *Marcus,* 198 Conn. 138, 141–42, 502 A.2d 869 (1985). The state's claim to aggrieved party status is based upon General Statutes § 47-65 (a), which provides, inter

alia, that the commissioner of environmental protection is responsible for the care and management of Indian reservation land. We hold that the state is not an aggrieved party because the state lacks legislative jurisdiction to regulate the Schaghticoke Indians.

One obstacle to state jurisdiction over Indians is the notion of tribal sovereignty. Prior to the Revolutionary War, England recognized Indian tribes as sovereign, but subjugated, nations. *Worcester* v. *Georgia*, 31 U.S. 515, 544–45, 8 L. Ed. 483 (1832). In *Worcester*, Chief Justice John Marshall held that the treaties and laws of the Union concerning Indians "contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union." Id., 557. It is clear from Justice Marshall's opinion that after the war, the view of Indian tribes as sovereign nations continued. According to Marshall, the exercise of state jurisdiction over an Indian tribe would be valid only "with the assent of [the tribe itself] or in conformity with treaties and with acts of Congress." Id., 560.

Article I, § 8, cl. 3, of the United States constitution gives Congress plenary authority over Indian affairs.[1] Pursuant to that authority, Congress in 1953 enacted Public Law 83-280[2] to enable states to assume the federal government's role and acquire jurisdiction over Indian matters. This legislation was enacted out of "congressional concern over law-and-order problems on Indian reservations and the financial burdens of continued federal jurisdictional responsibilities on Indian

---

[1] This constitutional provision provides in relevant part that Congress has the authority, "To regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes."

[2] Act of August 15, 1953, ch. 505, 67 Stat. 588, codified in part as amended at 25 U.S.C. § 1162 (1970) and 28 U.S.C. § 1360 (1970).

lands . . . ." *Washington* v. *Yakima Indian Nation,* 439 U.S. 463, 488, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979).

Public Law 83-280 granted criminal and civil juris-diction over Indian affairs outright to five states,[3] and, for the remainder of the states, the act set out certain procedures that must be followed before jurisdiction over Indians could be exercised.[4] If a state not expressly

---

[3] California, Minnesota, Nebraska, Oregon and Wisconsin. To this group, Alaska was added in 1958. Act of August 8, 1958, 72 Stat. 545, codified at 18 U.S.C. § 1162 (1970) and 28 U.S.C. § 1360 (1970).

[4] The Act provides in full:

"AN ACT

"To confer jurisdiction on the States of California, Minnesota, Nebraska, Oregon, and Wisconsin, with respect to criminal offenses and civil causes of action committed or arising on Indian reservations within such States, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that chapter 53 of title 18, United States Code, is hereby amended by inserting at the end of the chapter anal-ysis preceding section 1151 of such title the following new item:

" '1162. State jurisdiction over offenses committed by or against Indians in the Indian country.'

"SEC. 2. Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161, a new section, to be designated as section 1162, as follows:

" '§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

" '(a) Each of the States listed in the following table shall have jurisdic-tion over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

| " 'State of | Indian country affected |
| --- | --- |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

granted jurisdiction fails to follow the procedure set out in the act, then the state does not have jurisdiction over Indians. *Kennerly* v. *District Court of Montana,* 400 U.S. 423, 91 S. Ct. 480, 27 L. Ed. 2d 507

" '(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

" '(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section.'

"SEC. 3. Chapter 85 of title 28, United States Code, is hereby amended by inserting at the end of the chapter analysis preceding section 1331 of such title the following new item:

" '1360. State civil jurisdiction in actions to which Indians are parties.'

"SEC. 4. Title 28, United States Code, is hereby amended by inserting in chapter 85 thereof immediately after section 1359 a new section, to be designated as section 1360, as follows:

" '§ 1360. State civil jurisdiction in actions to which Indians are parties

" '(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

| " 'State of | Indian country affected |
| --- | --- |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

" '(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belong-

(1971); *Nenna* v. *Moreno,* 132 Ariz. App. 565, 566, 647 P.2d 1163 (1982). The state of Connecticut failed to acquire civil jurisdiction over Indian affairs under Public Law 83-280 through compliance with § 7 of the act. The Connecticut General Assembly would have had to bind the state to assumption of civil jurisdiction by affirmative legislation.

After 1968, Connecticut could no longer assume civil jurisdiction over Indian affairs simply by passing legislation. In that year, Congress passed the Indian Civil

---

ing to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

" '(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.'

"SEC. 5. Section 1 of the Act of October 5, 1949 (63 Stat. 705, ch. 604), is hereby repealed, but such repeal shall not affect any proceedings heretofore instituted under that section.

"SEC. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

"SEC. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Rights Act.[5] Section 403 of the 1968 Act repealed § 7 of Public Law 83-280. See 25 U.S.C. 1323 (b). Sections 401 and 402 of the 1968 Act replaced § 7 of Public Law 83-280. See 25 U.S.C. 1321 (a) and 1322 (a). Under § 402 of the 1968 Act, Connecticut could only assume civil jurisdiction over Indian affairs through the consent of the Indian tribes involved.[6]

States that acquired jurisdiction over Indian affairs under § 7 of Public Law 83-280 prior to its repeal in 1968 are exempt from the requirement of obtaining tribal consent.[7] Section 403 of the 1968 Act expressly provides that the repeal of § 7 of Public Law 83-280 "shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal." 25 U.S.C. § 1323 (b); see also *Kennerly* v. *District Court of Montana,* supra, 426 n.2.

We hold for the following reasons that the state of Connecticut has failed to acquire civil jurisdiction over the Indian tribes within its borders under the federal statutes. There is no jurisdiction under the Indian Civil Rights Act as the trial court found that the state never obtained the consent of the Schaghticoke tribe pursuant

[5] Public Law 90-284, act of April 11, 1968, 82 Stat. 79, codified as 25 U.S.C. §§ 1321 through 1326 (1970).

[6] Section 402 (a) provides: "The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."

[7] Under § 406 of the 1968 Act, the consent of a tribe can only be obtained through a majority vote of the adults of the tribe. See 25 U.S.C. § 1326.

to 25 U.S.C. § 1326. Between the years of 1953 and 1968, when Public Law 83-280 was in effect, the state could have acquired civil jurisdiction through affirmative legislation, but the Connecticut General Assembly did not pass such legislation during those years.

The Connecticut statutes regarding Indian tribes are insufficient to confer civil jurisdiction under § 7 of Public Law 83-280. Under the former General Statutes (Rev. to 1958) § 47-59, entitled "Overseer of Indians," the welfare commissioner was authorized to act as overseer of all Indian tribes residing within the state. Section 6 of Public Acts 1961, No. 304,[8] repealed General Statutes (Rev. to 1958) § 47-59. Section 4 of Public Acts 1961, No. 304,[9] which replaced former General Statutes § 47-59, provided in relevant part: "The welfare commissioner shall have the care and management of lands and buildings on reservations and the general care and management of all persons residing on such reservations. . . . Any person aggrieved by a decision of the welfare commissioner in regard to admission to or eviction from a reservation may appeal within one year of such decision to the court of common pleas for Hartford County or for the county in which such reservation is located." In 1973, General Statutes § 47-65 was amended by Public Acts 1973, No. 73-660. Among other changes, the act substituted the commissioner of environmental protection in the place of the welfare commissioner.[10] See *Rolling Cloud* v. *Gill*, 412 F. Sup. 1085 (D. Conn. 1976).

Although Public Acts 1961, No. 304, was enacted in 1961, while Public Law 83-280 was still in effect, there are several reasons why the state of Connecticut did

---

[8] Public Acts 1961, No. 304 was codified as General Statutes (Cum. Sup. 1963) §§ 47-59 through 47-66,

[9] Codified as General Statutes (Cum. Sup. 1963) § 47-65.

[10] The state has brought this appeal in reliance upon the authority of General Statutes § 47-65.

not acquire civil jurisdiction over Indian tribes through that statute. First, Public Acts 1961, No. 304, makes no mention of Public Law 83-280, which shows that Public Acts 1961, No. 304, was not enacted for the purpose of acquiring civil jurisdiction pursuant to the federal legislation. Second, Public Acts 1961, No. 304, does not call for the assumption of civil jurisdiction over all controversies that may arise in Indian country, but is instead limited to the assumption of jurisdiction over questions "in regard to admission to or eviction from a reservation." Finally, to hold that Connecticut has acquired civil jurisdiction over Indian tribes pursuant to Public Acts 1961, No. 304, would contradict the decision of the Connecticut federal district court in *Mashantucket Pequot Tribe* v. *McGuigan,* 626 F. Sup. 245 (D. Conn. 1986).

In *Mashantucket Pequot,* the court held that the state of Connecticut did not have jurisdiction to enforce its bingo statute; General Statutes § 7-169; on the reservation of the Western Pequot Tribe. Pursuant to the Connecticut Indian Land Claims Settlement,[11] the state acquired criminal jurisdiction, but not civil-regulatory jurisdiction, over the tribe. 25 U.S.C. 1755. The court characterized General Statutes § 7-169 as civil-regulatory, as opposed to criminal, in nature, and therefore held that the statute was unenforceable on the reservation.

The *Mashantucket Pequot* case stands for the proposition that Connecticut does not have civil-regulatory jurisdiction over Indians in Indian country. General Statutes § 47-65 is civil-regulatory in nature. It follows that the state derives no authority from § 47-65 over Indians in Indian country.

The state contends that its jurisdiction over the Schaghticoke Indians is not preempted by federal law

---

[11] 25 U.S.C. 1751 et seq.

because the Schaghticoke reservation is not Indian country. The federal statutes apply only to Indian tribes residing in Indian country. The definition of "Indian country" includes "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state." 18 U.S.C. § 1151 (b). The term "Indian country" has been "defined to encompass land anywhere in the United States inhabited by a 'dependent Indian communit[y],' [and will include the Schaghticoke reservation] *if*, as a bona fide tribe of Indians, the [Schaghticoke] inhabited that land and had 'Indian title' to it in 1790 when the Indian Trade and Intercourse Act [25 U.S.C. 177] became law, and *if* the status of the [Schaghticoke] and the nature of their occupancy of the land was the same [at the time the plaintiff's cause of action arose]." (Emphasis in original.) *State v. Dana,* 404 A.2d 551, 562 (Me. 1979), cert. denied, 444 U.S. 1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 (1980).

The record indicates that the Schaghticoke reservation is Indian country under 18 U.S.C. § 1151 (b). In its brief, the state cites J. De Forest, History of the Indians of Connecticut, (Republished: Scholarly Press, 1970), pp. 413–20, for the proposition that the Connecticut colony created the Schaghticoke reservation in 1752.[12] Hence, the Schaghticoke tribe had "Indian title" to the reservation in 1790, when the Noninter-

---

[12] "The township of Kent was sold to the original settlers by the colony; and no records or papers remain to show whether the land was usurped from the Indians, or was obtained from them by purchase. Reservations, however, were made to them: one on the west bank of the Housatonic River; and one, of two thousand acres, in the mountains: and, since there were reservations, we may conclude that there must have been, in the first place, sales. One of the only two land transactions, between the natives and the colony, to be found in the Kent records, is a deed dated December 19th, 1746.

"The other Indian deed in the Kent records is a sale by Chere son of Weraumaug, of four hundred acres in Weraumaug's Reserve, that is in New

course Act became law. Indian tribes do not hold land in fee simple absolute, and "Indian title" is nothing more than a right to occupy the land. *Worcester* v. *Georgia,* supra, 544.

Preston in Washington. The price is not mentioned: Chere only declares that he has received a valuable consideration.

"After the Connecticut people commenced their settlements in Kent, the Indians took up their residence chiefly on the west bank of the Housatonic. The settlers gradually encroached on them, by purchase and perhaps otherwise, until, about the year 1752, the Indians found themselves deprived of nearly all their lands on the plain. Mauwehu and fourteen others now subscribed a petition to the Assembly, saying that the tribe consisted of eighteen families; that they had been deprived of all their planting grounds except a small quantity which was insufficient for them; and praying that they might have a tract of unoccupied land which lay below them along the Housatonic.

"The Assembly granted them about two hundred acres in the place designated, allowing them to cultivate it at pleasure, and to cut what timber they needed for their own use, from the greatest part of it. The tract was not, however, given in fee simple, but was to be held by the Indians at the pleasure of the colony. . . .

"In 1775, the Assembly ordered that the lands of the Scatacooks should be leased to pay their debts and defray their expenses. It also ordered, with regard to David Sherman, that he should be bound out to service, to defray the expenses arising from his brother's broken head. Thomas Warrups, probably a son of the old sagamore of Reading, was allowed to sell thirty acres of land to pay his debts and provide for his family. Three years after, another tract, of ten acres, was sold for the purpose of relieving the indigent circumstances of the Warrups family. . . .

"In 1801, the Scatacooks were reduced to thirty-five idle, intemperate beings, who cultivated only six acres of ground. Their lands still amounted to twelve or fifteen hundred acres extending from the Housatonic to the New York line. The greatest portion of this tract consisted of their ancient hunting grounds, was situated among the mountains, and was rough and unsuitable for tillage. In consequence of sickness among the Indians, their overseer, Abraham Fuller, had contracted debts on their account to the amount of over four hundred dollars. He petitioned that part of the reservation might be sold, to pay him for these expenses. . . .

"Other portions of the Scatacook lands were disposed of at various dates; and these sales, together with the appointments of overseers, constitute the annuals of the tribe in later times. . . .

"The Scatacooks have yet a considerable tract of land on the mountain; too rough and woody indeed to be cultivated, but well adapted for supplying them with firewood. At the foot of the mountain, also, and between that and the Housatonic, they possess a narrow strip of plain, sufficient

There is no dispute as to the existence of the Schaghticoke tribe and that it is a native tribe in Connecticut and that it has a right to be on its reservation in Kent. This is set forth in Public Acts 1989, No. 89-368, §§ 16 and 22, which amended General Statutes §§ 47-59a and 47-63. The pertinent parts of those sections are as follows: "It is further recognized that said Indians have certain special rights to tribal lands as may have been set forth by treaty or other agreements. (b) The state of Connecticut further recognizes that the *indigenous* tribes, *the Schaghticoke,* the Paucatuck Eastern Pequot, the Mashantucket Pequot, the Mohegan and the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts, and (5) determine tribal leadership in accordance with tribal practice and usage." (Emphasis added.) Public Acts 1989, No. 89-368, § 16. "The following terms as used in this chapter shall have the following meanings: 'Indian' means a person who is a member of any of the following tribes . . . *Schaghticoke* . . . 'reservation' means . . . the *Schaghticoke reservation in the town of Kent, assigned to the Schaghticoke tribe* . . . ." (Emphasis added.) Public Acts 1989, No. 89-368, § 22.

---

in size for gardens, watered by springs from the upper ground, and containing a few comfortable houses. The number of Indians remaining in the fall of 1849 was eight or ten of the full blood, and twenty or thirty half-breeds. A few are sober and industrious, live comfortably and have good gardens, but the great majority are lazy, immoral and intemperate. Many of them lead a vagabond life, wandering about the State in summer, and returning to Scatacook to spend the winter. Three or four are in the habit of attending preaching, and a few of the children go to school. Their funded property now amounts to about five thousand dollars, and, for the last forty years, has more than paid the annual expenses of the tribe. . . . " J. De Forest, History of the Indians of Connecticut, (Republished: Scholarly Press, 1970), pp. 413-20.

The state intervened in this lawsuit on the assumption that the Schaghticoke tribe exists as a native tribe and occupies its reservation.

In its brief, the state bases its argument that the Schaghticoke reservation is not Indian country on the fact that the federal government has not recognized the Schaghticoke tribe by naming it in a treaty, agreement or statute. The state argues that the Schaghticoke tribe cannot be considered a "dependent Indian community" under 18 U.S.C. 1151 (b) because no trust relationship, or guardian-ward relationship, was ever established between the federal government and the Schaghticoke tribe. The same argument was considered and rejected in *Passamaquoddy Tribe* v. *Morton,* 528 F.2d 370, 377–79 (1st Cir. 1975). Federal recognition of a tribe through treaty or statute is merely one method to prove tribal existence, and it is not the only method. See *United States* v. *Sandoval,* 231 U.S. 28, 34 S. Ct. 1, 58 L. Ed. 107 (1913); *United States* v. *Boylan,* 265 F. 165 (2d Cir. 1920), appeal dismissed, 257 U.S. 614, 42 S. Ct. 113, 66 L. Ed. 397 (1921); see also F. O'Toole & T. Tureen, "State Power and the Passamaquoddy Tribe: 'A Gross National Hypocrisy?' " 23 Me. L. Rev. 1, 18 n.96, 19–20 n.100 (1971).

The *Mashantucket Pequot* case put an end to jurisdiction that Connecticut has exercised since 1639. The Warwick patent of 1631 established the boundaries of Connecticut. 1 F. Morgan, Connecticut as a Colony and as a State (1904), p. 251. The first settlements were established in 1635, and a separate civil government was established in 1639. Preface, General Statutes (1866 Rev.). The government was a constitutional republic. L. Mills, The Story of Connecticut (1932), p. 88. The General Court of Connecticut began to enact colonial laws in 1639. Preface, General Statutes (1866 Rev.).

In 1643, Connecticut, Massachusetts, Plymouth and New Haven formed the United Colonies of New England. Mills, supra, 132. "According to the terms

of this league, each colony elected two comissioners. To these eight men was given the control of Indian affairs and foreign relations. They were entrusted with the power of declaring war or making peace. Each colony, however, reserved full right to control its own affairs. Each colony, also, was to follow the decision of six out of eight commissioners with respect to Indian affairs and foreign relations. This meant that six out of the eight men must agree on a question in order to make it binding on the four colonies. The league continued in force for forty years, or until annulled by James II, when he recalled the colonial charter of Massachusetts." Id. The commissioners of the United Colonies of New England exercised jurisdiction over Indian tribes, and, in 1643, they tried and condemned the Indian Chief Miantonomo to death. Id., 134–35.

In 1662, the Connecticut colony obtained a charter from Charles II of England. Id., 187. "The charter was recognized as a continuation of the government already established, a guarantee of the title to the soil, and a safeguard against the aggressions of neighboring colonies and the encroachments of the Crown." Morgan, supra, 252. The Connecticut charter conveyed land title to the colony. *Worcester* v. *Georgia,* supra, 544. Title was conveyed in accordance with English common law, which means that the Crown conveyed only such title as it had itself, and no more. Id. The title that the Crown had, and which it conveyed, consisted of "the exclusive right of purchasing such lands as the natives were willing to sell." Id. The grant of land contained in the Connecticut charter "asserted a title against Europeans only, and [was] considered as blank paper so far as the rights of the natives were concerned." Id., 545.

Once the Connecticut charter was granted to the colony, the colony had no right to carry on relations with foreign governments or with Indian tribes. The Connecticut charter includes a general power to make defensive war, for good cause, upon the natives. Id.,

544. It also contains provisions calling for the religious instruction of Indians. Id., 545. The English government viewed the tribes as sovereign nations, and all authority to deal with the Indian tribes, aside from the authority expressly granted to the colonies through charter, was retained by the English sovereign. Id., 548.

It is clear from a proclamation made by the king of England in 1763 that the governors of the colonies were forbidden to exercise authority over Indian tribes residing on land that had not yet been purchased from them. See id., 546–47; see also *Mohegan Tribe* v. *Connnecticut,* 638 F.2d 612, 615 (2d Cir. 1980). Nevertheless, in 1669 the General Assembly passed a law providing "any indian that shall be guilty of wilfully murdering any other indian shall be put to death, on being thereof convicted before the superior court." See General Statutes (1808 Rev.) Title XC, § 2. Then in 1717, a bill was passed that provided, among other things, "That it shall be the duty of the civil authority and selectmen of such towns wherein are any tribe of indians, to take care that they be well acquainted with the laws of the [land], made for punishing such immoralities as they may be guilty of: and make them sensible that they are liable to the penalties, in case they transgress the laws." General Statutes (1808 Rev.) Title XC, § 1.

After the American revolution, the United States, "succeeded to all the claims of Great Britain, both territorial and political." *Worcester* v. *Georgia,* supra, 544. The constitution therefore granted Congress plenary authority over Indian tribes. U.S. Const., art. I, § 8, cl. 3. Nevertheless, Connecticut's colonial statutes concerning Indians were not repealed. See General Statutes (1808 Rev.) Title XC.

In 1821, the General Assembly passed legislation calling for the appointment of an "overseer of indians."

General Statutes (1821 Rev.) Title 50. In 1832, the Supreme Court decided *Worcester* v. *Georgia,* supra, holding that Indian tribes were subject to the exclusive jurisdiction of the federal government. Nevertheless, Connecticut legislation creating the position of "overseer of indians" was not repealed until the passage of Public Acts 1961, No. 304. See, e.g., General Statutes (1835 Rev.) Title 52; General Statutes (1902 Rev.) chapter 242.

The statutes creating an "overseer of indians" are the predecessors of the current General Statutes § 47-65. Section 47-65 purports to grant civil-regulatory authority to the state. Under the *Mashantucket Pequot* case, such authority is preempted by federal law. The foregoing history shows that the state never had the legal right to assume such authority in the first place.

Our inquiry does not end with the determination that Connecticut civil-regulatory jurisdiction over Indian tribes is preempted by federal legislation. In *Williams* v. *Lee,* 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959), the United States Supreme Court held that states not having acquired jurisdiction pursuant to the federal statutes may nevertheless exercise jurisdiction in a case involving Indians as long as the exercise of that jurisdiction does not infringe "on the right of reservation Indians to make their own laws and be ruled by them." Under the *Williams* infringement test, state courts can adjudicate common law tort and contract claims brought by Indians against non-Indians because such lawsuits did not interfere with tribal self-government. See *Three Affiliated Tribes* v. *Wold Engineering,* 467 U.S. 138, 148–49, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984) (*Three Tribes I*).

More recent Supreme Court cases reveal a " ' "trend . . . away from the idea of inherent Indian sovereignty as [an independent] bar to state jurisdiction and toward

reliance on federal pre-emption." ' " *Three Affiliated Tribes* v. *Wold Engineering,* 476 U.S. 877, 884, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986) (*Three Tribes II*). The preemption analysis "requires jurisdiction to be determined by examining treaties involving the particular Indian tribe and by examining federal legislation to determine if Congress intended the state to assume jurisdiction." T. Lynaugh, "Developing Theories of State Jurisdiction Over Indians: The Dominance of the Preemption Analysis," 38 Mont. L. Rev. 63, 84 (1977). The rise of preemption analysis is due to the fact that the Supreme Court now takes a more limited view of tribal sovereignity. An Indian tribe's "powers of self-government . . . involve only the relations among members of [the] tribe." *United States* v. *Wheeler,* 435 U.S. 313, 326, 98 S. Ct. 1079, 55 L. Ed. 2d 303 (1978); see also *Brendale* v. *Confederated Tribes & Bands of Yakima Indian Nation,* 492 U.S. 408, 425–26, 109 S. Ct. 2994, 106 L. Ed. 2d 343 (1989).

The dominance of preemption analysis in Supreme Court cases presents the question whether the sort of residual state court jurisdiction allowed in *Williams* v. *Lee,* supra, is preempted by federal law. One commentator, writing in 1977, speculated that the Supreme Court's reliance on preemption analysis, "together with Public Law 280 and the Indian Civil Rights Act of 1968, support the argument that the later enactments divested the state courts of jurisdiction they previously exercised, correctly or incorrectly, by providing a formal procedure for assumption of jurisdiction which, absent such formal assumption, results in the loss of all jurisdiction." Lynaugh, supra, 84 n.122. The Supreme Court expressly rejected this position, however, in *Three Tribes I,* supra. In *Three Tribes I,* the Supreme Court held that jurisdiction exercised by state courts over Indian tribes prior to the enactment of Pub-

lic Law 83-280 is not preempted by that act, and is a valid exercise of jurisdiction as long as it meets the *Williams* infringement test. Id., 150–51.

From the foregoing, we draw the following conclusions. Connecticut lacks civil-regulatory jurisdiction over Indian tribes. *Mashantucket Pequot Tribe* v. *McGuigan,* supra. General Statutes §§ 47-64, 47-65, 47-66 and 47-66g, the basis of the commissioner's statutory rights and obligations to manage tribal lands and to sue in her name to recover misappropriated tribal property, are civil-regulatory in nature and, therefore, are preempted and rendered invalid by federal law. It follows that the state lacks aggrieved party status because it does not derive a recognizable interest in this case through General Statutes § 47-65. As to the courts of this state, they may exercise civil jurisdiction over lawsuits involving Indian tribes to the extent that our state courts exercised such jurisdiction prior to the enactment of Public Law 83-280 in 1953 and to the extent that the exercise of such jurisdiction does not interfere with tribal self-government. *Three Tribes I,* supra.

The appeal is dismissed.

In this opinion FOTI, J., concurred.

BORDEN, J., dissenting. It may well be that the scholarly legal and historical analysis presented by the majority is correct, and that General Statutes § 47-65[1]

---

[1] General Statutes § 47-65 provides: "(a) The commissioner of environmental protection with the advice of the Indian Affairs Council shall have the care and management of reservation lands. The commissioner and the council shall establish the boundaries of such reservations by land survey and shall file a map of the same in the land records of the appropriate towns.

"(b) All reservation buildings not privately owned shall be subject to the care and management of the commissioner of environmental protection. The commissioner with the advice of the Indian Affairs Council shall, upon the petition of the resident make major repairs and improvements to the

is unconstitutional as violative of the federal supremacy clause. Of course, that would necessarily mean that the rest of chapter 824; General Statutes §§ 47-59a through 47-66g; is also unconstitutional.[2] On this record, however, for two related reasons, I cannot join in a decision having such monumental ramifications.

First, no challenge to the constitutionality of General Statutes § 47-65 was presented in this appeal. The majority raised this issue sua sponte. Until such a preemption challenge is clearly presented, we should presume that a state statute is not preempted by federal

exterior of any such building and its heating, water, electric, sewage disposal and plumbing systems as are necessary to insure habitable living conditions. The resident of any building shall assume responsibility for the interior maintenance of floors, walls and ceilings and minor maintenance of the building and its heating, water, electric, sewage disposal and plumbing systems, provided the commissioner shall supply necessary materials for such systems.

"(c) The council may, upon petition of an Indian resident without sufficient means to support himself, provide assistance in an amount necessary to maintain a standard of living in the home compatible with the well-being of the resident. The council shall provide other services as it deems necessary to insure the well-being of all persons residing on the reservations.

"(d) The commissioner and the council may adopt and amend regulations pursuant to chapter 54 to carry out the provisions of subsections (a) and (b) of this section. The council shall adopt regulations which prescribe eligibility standards for assistance and services under subsection (c) of this section.

"(e) The governor is hereby designated the administrative agent of the state to apply for any funds or other aid, cooperate and enter into contracts and agreements with the federal government, the Indian Housing Authority or any other appropriate state or local agency for the purpose of providing necessary services to housing projects to be located on Indian reservations within the state of Connecticut or for any other purpose which the Congress of the United States or the general assembly has authorized or may authorize for expenditures compatible with the services provided for in this chapter. The governor is authorized in the name of the state to make all applications, sign all documents, give assurances and do all other things necessary to carry out the provisions of this chapter."

[2] Chapter 824 of the General Statutes, entitled "Indians," contains a number of statutory provisions concerning Indian affairs and the relationship of the state to various Indian tribes.

law, unless, perhaps, it is clear beyond cavil that it is preempted. I do not believe that this record presents such clarity.

Second, the sua sponte nature of the declaration of statutory unconstitutionality has deprived the state of an opportunity to respond. We have on occasion dismissed an appeal sua sponte for lack of subject matter jurisdiction without first affording the appellant an opportunity to respond to our jurisdictional concerns. Here, however, the majority's determination that the state has no standing to appeal derives from a declaration of unconstitutionality of an entire statutory scheme. Appellate prudence mandates that the issue be set down for reargument, with notice to the state of the nature of our jurisdictional doubts.

I, therefore, dissent from the dismissal of the appeal. I would set the case down for reargument on the issue of whether the state has standing to appeal based on General Statutes § 47-65.