[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO DISMISS
This is a criminal prosecution in which defendant stands charged with violating the criminal law of the State of Connecticut. Defendant has been charged with two counts of assault on an officer in violation of General Statutes53a-167c, one count of inciting injury to persons in violation of General Statutes 53a-179a, interfering with an CT Page 6930-A officer in violation of General Statutes 53a-167a, and, disorderly conduct in violation of General Statutes 53a-182.
The charges are pending before the Superior Court, Geographical Area 10, within the New London Judicial District.
It is alleged, and not disputed by the State, that, defendant is an Indian and the events which resulted in the arrest and prosecution on the above noted charges occurred in "Indian country" on the Mashantucket Pequot reservation within the State of Connecticut. Defendant has moved to dismiss the action claiming that the state does not have subject matter jurisdiction because Congress has not granted the State criminal jurisdiction over Indians on the reservation.
For reasons hereinafter stated it is found that the State does have criminal jurisdiction to prosecute this action and the motion to dismiss is denied. CT Page 6930-B
Although the motion to dismiss, dated October 29, 1992 advances two separate grounds for dismissal, at oral argument, it was acknowledged by defendant that the second claim has been abandoned and all parties have addressed only the question of subject matter jurisdiction. The court, therefore, has addressed only this issue of subject matter jurisdiction.
For the purposes of this motion only, with the understanding that it does not constitute an admission by defendant against his penal interest, the parties have agreed that the following factual situation underlies the State's case.
In connection with this statement of facts, it is noted that defendant is an Indian, but a member of the Narragansett tribe and not a member of the Mashantucket Pequot tribe. All parties agree that defendant's not being a member of the tribe has no legal significance. It is agreed that at the time of the alleged offense defendant Spears was CT Page 6930-C an Indian in Indian country.
At approximately 11:00 p.m. on November 29, 1991, an anonymous 911 call was received by the State Police alleging a major disturbance and violent activity occurring at 8 Elizabeth George Drive, Ledyard, Connecticut. Such residence is located on the Mashantucket Pequot Reservation. As a result of the call, Trooper Robert D. Maynard of the State Police was dispatched to that location to investigate the matter. Being unfamiliar with the exact location of the residence, he was provided assistance by Ledyard Town Constables Sgt. Guiher and Officers Craig and Blanchette. Upon arrival at the residence, the officers were admitted by one Keri Spears who it was later determined was a resident of the premises and the wife of the defendant. Mrs. Spears, who appeared quite upset, advised the officers that a short time earlier the defendant, who was somewhat intoxicated, had become violent, had thrown things around the house, and had thrown a chair into a wall. Upon being shown around the residence by Mrs. Spears, Trooper Maynard noticed the indentation in the wall allegedly caused by the chair, the CT Page 6930-D telephone that had been ripped from its connection, and other items in disarray. The defendant was not present at the residence at this time, but some children and at least two other adults were present. Shortly after the officers had completed viewing the premises, the defendant returned home. He appeared to the officers to be somewhat intoxicated and clearly is an agitated condition. Almost immediately after his arrival he used profanity addressed to the officers, demanding that they leave his residence and stating that they had no right to be there. The officers tried to quiet him as he sat in the living room in the presencs [presence] of the other adults, but were unable to do so. Trooper Maynard, being concerned for the well-being of the persons in the household, arrested the defendant on the charge of disorderly conduct. The defendant refused to leave his residence. Sgt. Guiher, who knew the defendant, talked him into going from the living room to the dining room where they sat at a table. After talking for a short while, the defendant continued in his refusal to accompany the officers, stood up and made a threatening gesture to Guiher. Guiher then used Cap-Stun to temporarily disable the accused so he could be taken into CT Page 6930-E custody. As the defendant was being taken into custody by Trooper Maynard and Constable Craig, he fought with them, striking both Maynard and Craig, injuring each of them. He was finally cuffed and removed from the residence.
During the above period of time, other adults had entered the residence and the defendant called to them for help in preventing the officers from taking him from the premises. He stated (in words more offensive than expressed here) that since the officers were not U.S. Marshalls they had no right to be in his premises; he encouraged others present to go and round up the Tribe; he encouraged others to help him get away from the officers; he stated, "This is Custer's last stand and the Indians will win."
In response to his remarks, other persons present in the living room attempted to get into the dining room/kitchen area, were becoming more hostile, and it was necessary for Sgt. Guiher and Officer Blanchette, who had already called for "back-up", to physically block the entrance and restrain a number of people. CT Page 6930-F
After defendant's arrest and presentment on the above charges, his attorney filed the present motion to dismiss.
On December 14, 1992, the Mashantucket Tribe, claiming that the jurisdictional issues involved in this case would have a profound and long lasting effect on the Tribe's relationship with the State of Connecticut, moved to intervene as amicus curiae. This motion was granted on December 15, 1992.
The Tribe, as amicus curiae, has filed briefs and argued in support of defendant's position that the state has no subject matter jurisdiction to prosecute this case. Since the position of the Tribe and defendant are identical, for purposes of simplicity, defendant and the Tribe will be referred to collectively as "defendant."
On February 10, 1993, the United States, claiming that it had an interest in the proceedings, moved to appear CT Page 6930-G as amicus curiae. That motion was granted on February 17, 1993 and the United States has filed a brief and argued in support of the State of Connecticut's position that the State and not the Federal Government has jurisdiction to prosecute defendant for state crimes committed on the Mashantucket Pequot Reservation.
Defendant claims that the federal government has exclusive criminal jurisdiction over Indians on the reservation of the federally recognized tribe and that the State of Connecticut has no such jurisdiction. In this claim defendant relies on the well-established principle that states cannot exercise jurisdiction on Indian reservations unless Congress has specifically authorized such jurisdiction. The states have never had inherent authority over Indians in Indian country. Worcester v. State of Georgia, 31 U.S. 515, 8 L.Ed. 483 (1832). When the states adopted the United States Constitution they specifically acknowledged the exclusive plenary power of the Federal Government over Indians in Indian country. U.S. Constitution Art. I, Sec. 8, cl. 3; Schaghticoke Indians of Kent, CT Page 6930-H Connecticut, Inc. v. Potter, 22 Conn. App. 229, 231,577 A.2d 719 (1990).
It necessarily follows then that if Connecticut has criminal jurisdiction on the Mashantucket Pequot Reservation, as claimed, such jurisdiction must have been granted by Congress. The federal statute which vests the state with such jurisdiction is the Connecticut Indian Land Claim Settlement Act. 25 U.S.C. § 1751-1760.
By way of background, the Mashantucket Pequot Tribe is the successor to the claims of the Western Pequot Tribe of Indians. Prior to 1983, the Tribe asserted its claimed rights to public and private land in the Town of Ledyard. It was claimed that such lands, originally the property of the Tribe, were wrongfully misappropriated in violation of the Federal Constitution and the laws of the United States. The Tribe's claims were the subject of a lawsuit in the Federal District Court for the District of Connecticut entitled Western Pequot Tribe of Indians v. Holdridge Enterprises, Inc., Civil H-76-193. It was to resolve these claims and to CT Page 6930-I eliminate the cloud on titles to lands resulting from the Indian claims that the Settlement Act was enacted in 1983. Mashantucket Pequot Tribe v. McGuigin, 626 F. Sup. 245, 246
(D.Conn. 1986).
Whether or not criminal jurisdiction over Indians on the Mashantucket Reservation was given to the State of Connecticut by the Settlement Act depends on the intent of Congress as expressed in the act.
Defendant argues that land set aside as an Indian reservation is territory over which Indian tribes are generally self-governing and from which state jurisdiction is usually excluded. Because of this Indian imunity [immunity] doctrine, jurisdiction over crimes by Indians on reservations has been overwhelmingly left to the tribe. Defendant cites authority for the proposition that Congress can authorize state jurisdiction over crimes by Indians in Indian country but it is done so rarely and it must be done expressly. A state's right to prosecute Indians will not be lightly inferred or assumed by the courts. Washington v. Confederated Bands and CT Page 6930-J Tribes of the Yakima Indian Nation, 439 U.S. 463, 470-71,99 S.Ct. 740, 58 L.Ed.2d 736 (1973).
Defendant argues that because of these principles the statutes in question must be liberally interpreted for the benefit of the tribe. In the recent case of Negonsott v. Samuels, ___ U.S. ___, 113 S.Ct. 1119, 122 L.Ed.2d 457
(1993), however, the United States Supreme Court found that the conferral of criminal jurisdiction on the State of Kansas could be a benefit to the tribes in question. In so deciding, the court drew a distinction between a law for the benefit of dependent Indian Tribes and a law for the benefit to accused Indian criminals.
Notwithstanding of the general law applicable to state jurisdiction over Indians in Indian country in interpreting statutes, the function of the court is to give effect to the will of Congress and "where its will has been expressed in reasonably plain terms, `that language must ordinarily be regarded as conclusive.'" (Citation omitted.) Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 CT Page 6930-K S.Ct. 3245, 73 L.Ed.2d 973 (1982).
The section of the Settlement Act which bears directly on the issue is 1755 entitled "State jurisdiction over reservations." The language of the section is as follows:
 Notwithstanding the provision relating to a special election in section 406 of the Act of April 11, 1968 (82 Stat. 80; 25 U.S.C. § 1326) [25 U.S.C.A. 1326], the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act [25 U.S.C.A. 1321 et seq.].
The plain meaning of this section of the Act is that, notwithstanding the provision relating to a special election in another statute (25 U.S.C.A. 1326), the reservation created by the Settlement Act is declared to be[1]
CT Page 6930-L Indian country subject to State jurisdiction to the maximum extent provided by 25 U.S.C.A. 1321.
This latter statute entitled "Assumption by State of criminal jurisdiction" provides as follows:
 The consent of the United States hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such state has jurisdiction over any such offense committed elsewhere CT Page 6930-M within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.
As noted, 1755 of the Settlement Act clearly indicates the intent of Congress that the State should have jurisdiction to the maximum extent provided by25 U.S.C.A. 1321. This statute grants complete criminal jurisdiction to the states so that the criminal laws of the State have "the same force and effect within such Indian country or part thereof, as they have elsewhere in the State."
The Settlement Act thus appears to have effected a complete grant of criminal jurisdiction over the reservation to the State.
Section 1755 vests jurisdiction in the state "notwithstanding the provisions relating to the special elections in section 406 of the Act of April 11, 1968. . . ." CT Page 6930-N
Section 406 of the Act of April 11, 1968, now25 U.S.C. § 1326, provides as follows:
 State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults.
The phrase "Notwithstanding the provisions relating CT Page 6930-O to a special election in section 406" clearly indicates the intent of Congress to dispense with the special election requirement of 406 and vest jurisdiction over criminal offenses on the reservation in the state without the requirement of a tribal vote. Defendant does not dispute this interpretation, but claims that federal law requires an additional vote not covered by the Settlement Act.
Defendant's position is that the Settlement Act generally follows the provisions of Public Law 280 (codified as 25 U.S.C. § 1321-26) which authorizes the transfer to states of certain on-reservation jurisdiction over Indians. is claimed by defendant that under Public Law 280 assumption of jurisdiction is predicated upon two separate and independent provisions for consent by the affected Indian tribe.
The first tribal consent provision defendant argues is a general consent of the tribe found in 25 U.S.C. § 1321. The second consent provision in the tribal vote requirement set forth in 25 U.S.C. § 1326. CT Page 6930-P
It is defendant's claim that under the Settlement Act Congress eliminated any requirement for the tribal vote under 25 U.S.C. § 1326, but did not eliminate the general consent required under 25 U.S.C. § 1321. Since the tribe has never given this general consent, defendant claims that the State has not acquired criminal jurisdiction over Indians on the reservation, and the motion to dismiss must be granted.
Defendant's argument that Public Law 280 requires two tribal votes is not persuasive.[2]
Public Law 280 was enacted to allow state jurisdiction over Indians on reservations where the provision of the Act had been complied with. "The primary concern of Congress in enacting Public Law 280 that emerges from its sparse legislative history, was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institution for law enforcement." Bryan v. Itasca Cty, Minnesota, 426 U.S. 373, 379, 95 S.Ct. 2102,2106, 98 L.Ed 710 (1976). CT Page 6930-Q
Section 1321 of the Act, gives to any state not having it, the consent of the United States, to assume jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such state "with the consent of the Indian tribe occupying the particular Indian country as part thereof." There is no further elaboration on what is meant by consent or how it is to be obtained.
Section 1326 of the Act, previously quoted, sets forth in detail how consent of the tribe may be obtained. It is reasonable to conclude that the acceptance procedure detailed in 1326 was intended by Congress to be the vehicle whereby the consent of the tribe mentioned in 1321 would be determined. No plausible reason has been advanced as to why a tribe would have to undergo duplicate votes on the same subject.
In Kennerly v. District Court of Ninth J.D. of Montana, 400 U.S. 423, 429, 91 S.Ct. 480, 483, 27 L.Ed.2d CT Page 6930-R 507 (1971) the United States Supreme Court reached the same conclusion that 1326 set forth the procedures by which tribal consent must be manifested.
It is clear then that only one vote is required of a tribe to consent to the state criminal jurisdiction under Public Law 280 and the procedure for the special election to effect such vote has been set forth in 406 (25 U.S.C. § 1326). Since the Settlement Act dispenses with this special election and grants criminal jurisdiction in the State of Connecticut without the requirements of any such vote, it must be concluded that criminal jurisdiction has been fully vested in the State of Connecticut.
Even if defendant was correct in his argument that the Act of April 11, 1968 required two separate expressions of consent on the part of the tribe, such argument would not be persuasive.
Jurisdiction was granted to the State here, not by the Act of April 11, 1968, but by the Settlement Act. CT Page 6930-S Although the Settlement Act, incorporated by reference, the provisions of the general Act granting state jurisdiction over Indians in Indian country and dispensed with the special election provision required by 406 (25 U.S.C.A. 1326), it did not adopt all of the provisions of the general act.
Assuming, for purposes of argument, that the Act of April 11, 1968 required a separate expression of tribal consent as claimed, there is nothing to indicate that Congress intended to incorporate such consent into the Settlement Act.
Other factors tend to confirm that by the Settlement Act Congress intended to grant criminal jurisdiction over Indians on the reservation to the State.
 I
The conclusion that the Settlement Act grants criminal jurisdiction over Indians on the reservation to the State of Connecticut is consistent with other decided cases. CT Page 6930-T
In Mashantucket Pequot Tribe v. McGuigan, supra, the court was asked to decide whether or not state laws regulating bingo games could be enforced on the reservation. The State claimed than it could regulate bingo on the reservation under its general authority to enforce criminal laws on the reservation. The court (Dorsey District Judge) decided that the state laws covering bingo were not criminal but were regulatory in nature and, therefore, such laws were found not to be enforceable "under a grant of jurisdiction over criminal law" supra 249. In so deciding, while the court did not find directly that Connecticut had criminal jurisdiction on the reservation, it did imply such jurisdiction. There would have been no need to differentiate between criminal law and laws which regulate conduct if the State had no criminal jurisdiction.
In this connection see Schaghticoke Indians of Kent, Connecticut, Inc. v. Potter, 22 Conn. App. 229, 237,577 A.2d 719 (1990), Aff'd 217 Conn. 612, 615 n. 3,587 A.2d 139 (1990). CT Page 6930-U
The same issue presented here came before the court on a motion to dismiss for want of jurisdiction in State v. Donald E. Dagett, Superior Court, G.A. 10, judicial district of New London, Docket No. CR10-16-936 (O'Connell, J.). In that case, Dagett, an Indian, was arrested for violation of the criminal law of the State of Connecticut on the Mashantucket Reservation in 1987.
Dagett moved to dismiss raising the issue of jurisdiction now before this court. The matter was briefed, and after argument the court denied the motion concluding that the State had criminal jurisdiction to prosecute Indians on the reservation for violations of Connecticut criminal law. No appeal was taken from Dagett's subsequent conviction.
 II
The United State's Attorney for the District of Connecticut opposes the motion to dismiss and has concluded CT Page 6930-V that the State of Connecticut has jurisdiction over crimes committed on the reservation. His opinion is expressed in the memorandum dated February 12, 1992, from Albert S. Dabrowski, United State's Attorney District of Connecticut to the Special Agent In Charge Federal Bureau of Investigation, New Haven, Connecticut. In the cover letter to that letter Mr. Dabrowski stated:
 "It is the opinion of the Office that criminal jurisdiction of the State of Connecticut and the United States Government is the same on the Mashantucket Pequot Indian Reservation as it is elsewhere in Connecticut. That is to say, the State of Connecticut has the same power and authority to enforce state criminal laws on the Reservation as it does, for example, in downtown New Haven or elsewhere in the State. Similarly, federal jurisdiction on the Reservation is the same as it is in other parts of CT Page 6930-W the State.
This opinion of the United States Attorney on the issue of federal-state criminal jurisdiction the reservation is significant since, if defendant was correct, in his position that only federal criminal law is applicable to Indians on the reservation, the United States Attorney would be responsible for enforcing federal law on the reservation. In this regard it is well established that "courts should accord great deference to the construction given a statute by the agency charged with its enforcement." Board of Education v. Connecticut State Board of Labor Relations, 190 Conn. 235,241, 460 A.2d 1255 (1983).
 III
Prior actions of the tribe are also consistent with state criminal jurisdiction over the reservation and indicate an understanding by the tribe that the Settlement Act placed such jurisdiction with the state.
Section 1758(b) of the Settlement Act required the CT Page 6930-X tribe to file with the Secretary of the Interior a copy of its organic governing document which must be consistent with the terms of the Act.
On November 20, 1991, the tribal council enacted Ordinance Number 112091-01 as the Mashantucket Pequot Tribal Law and Order Code. There is nothing to indicate that this ordinance was filed with the secretary in compliance with the Act, but, it is logical to assume that it was done or mat any document so filed would be consistent with the ordinance. It is also logical to conclude that in enacting the ordinance, the tribal council intended that the Law and Order Code be in accordance with the Settlement Act.
The ordinance clearly indicates an understanding by the tribe that state criminal law extended over the reservation without exception. Section 5 of the Ordinance, entitled "Concurrent jurisdiction Over State Offenses" provides that the Pequot Tribal Police Department shall exercise "concurrent authority with law enforcement officers of the State of Connecticut to make arrests for violation of CT Page 6930-Y criminal laws of the State. . . ." This section also provides:
 ". . . however, that persons arrested by officers of the Mashantucket Pequot Tribal Police Department for such violations of criminal laws of the State of Connecticut shall be transferred as promptly as may be feasible to the jurisdiction of State law enforcement officers and the Mashantucket Pequot Tribal Police Department shall comply with all reasonable requirements of State law enforcement officers and agencies in order to assist in the prosecution of such offenders under the laws of the State of Connecticut."
This is nothing to indicate a claim that the jurisdiction of the State was limited to a particular area of the reservation or that Indians were excluded from the application. CT Page 6930-Z
The preamble to the ordinance mentions the Gaming Compact with the State. This document, approved by the State and the tribe filed with the Federal Government, also indicates a recognition that State criminal law applied on the reservation without restriction. Section 4(a) entitled "State criminal jurisdiction" contains the following sentence:
 "The State of Connecticut shall also have jurisdiction to enforce all other criminal laws of the State which are consistent with the provisions of this Compact on the Reservation, including enforcement within the gaming facilities."
The phrase "including enforcement within the gaming facilities" indicates an understanding that state criminal laws are in force throughout the reservation.
Subsection (c) entitled "Powers of Tribal Law CT Page 6930-AA Enforcement Officers" indicates an understanding on the part of the tribe that its police officers have concurrent authority with "law enforcement officers of the State of Connecticut" to enforce the law and make arrests for "violation of applicable criminal laws of the State." The section also provides for the transfers of persons arrested by tribal law enforcement officers to jurisdiction of the State.
The ordinance and the compact, both promulgated by the tribe implement the Settlement Act shortly after its enactment clearly indicate the Tribe's then understanding that State criminal law applied throughout the Reservation without restriction.
Resolution No. E 111 93-02 of January 11, 1993 in which the Tribal Council voted to exercise Tribal sovereignty to the maximum extent possible and to retain criminal (and civil) jurisdiction within the boundaries of the reservation to the maximum extent possible is not persuasive. This expression of tribal intent comes well after the prior votes CT Page 6930-BB and after the conclusion of State v. Dagett and start of this action.
It is significant to note that there is no mention of Federal criminal jurisdiction in any of the Tribal Council votes.
 IV
A Congressional decision to place criminal jurisdiction over the Reservation with the state was logical and in accordance with the general concern of the government for the protection of people on the reservation.
Section 1751 of the Settlement Act contained certain findings made by Congress in connection with the establishment of the reservation. Subsection (f) of 1751 included the following:
 The State of Connecticut has provided special services to the members CT Page 6930-CC of the Western Pequot Tribe residing within its borders. The United States has provided few, if any, special services to the Western Pequot Tribe and has denied that it had jurisdiction over or responsibility for said Tribe. In view of the provisions of land by the State of Connecticut, the provision of paved roadways by the State of Connecticut, and the provision of special services by the State of Connecticut without being required to do so by Federal law, it is the intent of Congress that the State of Connecticut not be required to otherwise contribute directly to this claims settlement.
This Act does not define "special services" or otherwise state what Congress meant by the term. It is logical to conclude, however, that such special services included the protection of the criminal laws of the State CT Page 6930-DD afforded to all persons including Indians on the Reservation.
In Bryan v. Itasca Cty, Minnesota, supra 379-80 the United States Supreme Court reviewed the concern of Congress in enacting Pub.L. No. 280 which allowed criminal jurisdiction over Indians on reservations to be transferred to the state. The court reviewed problems encountered with Indian and Federal Courts handling such matters and included in such the following:
 "As a practical matter, the enforcement of law and order among the Indians in the Indian country has been left largely to the Indian groups themselves. In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and CT Page 6930-EE willingness to accept such responsibility." H.R. Rep. No. 848, 83rd Cong., 1st Sess., 5-6 (1953), U.S. Code Cong. Admin. News 1953, pp. 2409, 2411-2412.
At the time the Settlement Act became law, the tribe consisted of 245 enrolled members with 175 then living on a Reservation of 1,240 acres in rural Connecticut.
There is nothing to indicate that at that time the tribe was in any way organized to maintain law and order on the reservation or to afford to anyone the protection of a court system. This was recognized by the tribe in the preamble to the ordinance of November 20, 1991 when the tribal council stated:
 ". . . this Council has determined that there are presently insufficient law enforcement resources available to protect the public order and public CT Page 6930-FF safety on the Mashantucket Pequot Reservation; . . ."
Under such circumstances it was logical for Congress to continue criminal jurisdiction over the reservation, including Indians on the reservation, in the State of Connecticut and the State of Connecticut agreed to provide services under such jurisdiction by the Special Act NO 82-31, an act to implement the settlement of the Mashantucket Pequot Indian claims.
Accordingly, the motion to dismiss is denied.
Purtill, J[.]