SCHAGHTICOKE INDIANS OF KENT, CONNECTICUT, INC.
*v.* KEITH POTTER ET AL.
(14005)

PETERS C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued December 5, 1990—decision released March 5, 1991

*Grace M. Dodier,* assistant attorney general, with whom were *Robert B. Teitelman* and *Joseph Rubin,* assistant attorneys general, and, on the brief, *Clarine Nardi Riddle,* then attorney general, for the appellants (intervening plaintiffs).

*William R. Breetz,* with whom were *Iris J. Brown* and, on the brief, *Lewis K. Wise,* amici curiae.

*Richard B. Stewart,* assistant attorney general, *Stanley A. Twardy, Jr.,* United States attorney, *Carl Schuman,* assistant United States attorney, *Robert L. Klarquist* and *Edward J. Shawaker,* filed a brief for the United States as amicus curiae.

*Julia T. Bradley* filed a brief for the Indian Law Project as amicus curiae.

COVELLO, J. This appeal concerns the right of the state of Connecticut to intervene in a dispute between an Indian tribe and its alleged tribal chief. The dispositive issue is whether Connecticut courts can exercise civil jurisdiction over actions involving only Schaghticoke Indians and relating solely to the Schaghticoke reservation. This, in turn, depends on: (1) whether federal law preempts the exercise of state civil jurisdiction over the Schaghticoke reservation; or (2) whether the residual sovereignty of the Schaghticoke tribe acts as an independent bar created by federal law to the jurisdiction of the state courts. We conclude that the record is inadequate to determine either issue and therefore remand the case to the trial court for further proceedings.

On September 22, 1987, the plaintiff, Schaghticoke Indians of Kent, Connecticut, Inc., filed a complaint in the Superior Court seeking damages from the defendant Potter[1] and the defendant Russell. The complaint alleged that on September, 29, 1984, Alan Russell, claiming to be the chief of the Schaghticoke Indian Tribe, signed a contract with Keith Potter, a non-Indian. In the contract Russell authorized Potter to cut and remove 30,000 board feet of timber in a manner designed to preserve the integrity of the Indian reservation. The complaint further alleged that Potter had cut in excess of 250,000 board feet of timber and had caused significant collateral damage to reservation lands. The plaintiff further claimed that the defendant Russell had failed to account for the proceeds for the sale of the timber and had failed to obtain the consent and approval of the tribal council to the contract.

On July 29, 1988, the state of Connecticut and the department of environmental protection (DEP) moved to intervene claiming that, pursuant to General Statutes § 47-65, the commissioner of the DEP had the duty to protect Indian reservation land and to assure that the value of the lost timber was placed in the tribal fund accounts.

On March 7, 1989, Russell moved to dismiss the action, claiming that the predicate acts took place on an Indian reservation and involved members of an Indian tribe. Russell claimed that, because this was wholly an internal tribal dispute, the trial court lacked subject matter jurisdiction. The trial court granted the motion to dismiss, concluding that Connecticut had failed to assume jurisdiction over the Schaghticoke reservation pursuant to the relevant federal procedures and, therefore, that the court lacked the requisite

---

[1] The defendant Keith Potter is not presently in this action and the claims against him are being pursued in the Bankruptcy Court.

authority to hear the case. The state and the DEP appealed to the Appellate Court which dismissed the appeal.[2] *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter,* 22 Conn. App. 229, 577 A.2d 719 (1990). We granted certification limited to the following issues: (1) whether the state, as intervenor, has the right to appeal what is allegedly an internal Indian tribal dispute;[3] and (2) whether the Connecticut courts have civil jurisdiction over the state's Indian tribes and reservations.

## I

The original plaintiff declined to appeal the judgment of the trial court. It is, therefore, incumbent on the state, as intervenor, to demonstrate that it has standing to maintain this appeal. *Diamond* v. *Charles,* 476 U.S. 54, 68, 106 S. Ct. 1697, 90 L. Ed. 2d 48 (1986). Standing is present "when a complainant makes a colorable claim of [a] direct injury he has suffered or is likely to suffer, in an individual or representative capacity." *Maloney* v. *Pac,* 183 Conn. 313, 321, 439 A.2d 349 (1981). The state and the DEP claim a personal stake in the outcome of the controversy because

---

[2] Neither the original plaintiff nor the defendants joined in the appeal to the Appellate Court. Likewise, the only parties to file briefs and appear before the Supreme Court are the state as intervenor, and Attorney William Breetz as amicus. Because of the importance of the issues presented, we granted permission to the United States and the Indian Law Project to file amicus briefs.

[3] We note that the dispute in this civil case involves only Indians and relates solely to acts taking place on the reservation. Thus, this opinion in no way addresses the very different questions of whether the state retains criminal jurisdiction over actions occurring on an Indian reservation or whether the state reserves civil jurisdiction over disputes between Indians and non-Indians occurring off a reservation. In this regard we note that a federal district court sitting in Connecticut has held recently that Connecticut has acquired criminal, but no civil, jurisdiction over state Indian tribes. *Mashantucket Pequot Tribe* v. *McGuigan,* 626 F. Sup. 245, 249 (D. Conn. 1986).

it is required, under General Statutes §§ 47-65 and 47-66, to preserve the state's Indian reservations and tribal funds.

General Statutes § 47-59a, as amended by Public Acts 1989, No. 89-368, states, in relevant part, that: "The state of Connecticut further recognizes that . . . the Schaghticoke . . . [is a] self-governing [entity] possessing powers and duties over tribal members and reservations. Such powers and duties include the power to . . . (4) make contracts, and (5) determine tribal leadership in accordance with tribal practice and usage." Thus, were this enactment controlling, the state's general supervisory authority over Indian affairs pursuant to § 47-65 would be subordinated to the specific authority granted to the Schaghticoke by Public Act No. 89-368.

The actions of the defendants that allegedly caused injury to the reservation, however, took place on September 29, 1984, before the passage of Public Act No. 89-368 amending § 47-59a. "General Statutes § 1-1 (u) provides that '[t]he passage or repeal of an act shall not affect any action then pending.' We have construed that provision to mean that '[s]tatutes should be construed retroactively only when the mandate of the legislature is imperative.' " *Sherry H.* v. *Probate Court,* 177 Conn. 93, 100, 411 A.2d 931 (1979). Because there is no language in the statute or its legislative history suggesting that the legislature intended Public Act No. 89-368 to have retroactive application, we conclude that it is not controlling in this case.

Because Public Act No. 89-368, granting legislative power to the Schaghticoke tribe, is not applicable here, we conclude that the state, through the commissioner, had the statutory obligation to oversee the Schaghticoke reservation. Section 47-65 (a) states, in relevant part, that "[t]he commissioner of environmental pro-

tection . . . shall have the care and management of [Indian] reservation lands." Further, § 47-66 adds that "[t]ribal funds shall be under the care and control of the commissioner of environmental protection . . . ." Because the complaint alleges that the defendant "has failed to account for all of the sums of money" involved and has caused "serious" damage to the reservation, and because the DEP is responsible under the statute for damage to the reservation and misuse of tribal funds, we conclude that the state and the commissioner had standing and are thus authorized to appeal.

## II

The remaining certified question, however, is whether the state of Connecticut has civil jurisdiction over Indian tribal matters arising within the state. Jurisdiction over Indian tribes and reservations implicates two separate principles. The first is the extent to which Congress has preempted the field by exercising direct control over the Schaghticoke Indians pursuant to its powers set out in the federal constitution,[4] and the second is the extent to which the Schaghticoke Indians have retained a residual and demonstrable tribal sovereignty as recognized by federal case law. *White Mountain Apache Tribe* v. *Bracker,* 448 U.S. 136, 144, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980).

"This congressional authority [pursuant to Art. I, § 8, cl. 3,] and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. . . . Second, [a state enactment] may unlawfully

---

[4] The Indian Commerce Clause, Art. I, § 8, cl. 3, of the federal constitution states: "The Congress shall have the Power to . . . regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes . . . ."

infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' . . . The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." (Citations omitted.) *White Mountain Apache Tribe* v. *Bracker,* supra, 142–43.

### Federal Preemption

In 1953, Congress passed Public Law 83-280; 67 Stat. 588, Eighty-Third Congress, codified at 18 U.S.C. § 1162 and 28 U.S.C. § 1360; in an effort to regulate the assumption of state jurisdiction over Indian tribes.[5] As a threshold matter, the state argues that federal Public Law 83-280 does not preempt state civil jurisdiction over the Schaghticoke reservation because this law only applies to federally recognized "Indian country." The state argues that neither the Schaghticoke tribe nor their reservation have ever been recognized by the federal government and therefore that 18 U.S.C. § 1162 and 28 U.S.C. § 1360 do not apply.

"Indian country" under 18 U.S.C. § 1151 (b) is defined as "all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state." (Emphasis added.) No federal statute defines "dependent Indian community."

Courts have developed two distinctly different tests for deciding whether a given group of Indians constitutes a *dependent Indian community* for the purposes of federal law. *State* v. *St. Francis,* 151 Vt. 384, 386–87, 563 A.2d 249 (1989). The first test is the one set out in *State* v. *Dana,* 404 A.2d 551 (Me. 1979), cert. denied,

---

[5] See C. Goldberg, "Public Law 280: The Limits of State Jurisdiction over Reservation Indians," 22 UCLA L. Rev. 535 (1975).

444 U.S. 1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 (1980). An alternative test is found in *United States* v. *Martine,* 442 F.2d 1022 (10th Cir. 1971), and *United States* v. *South Dakota,* 665 F.2d 837 (8th Cir. 1981). Under this alternative test a court is required to determine (1) whether the federal government retained title to the land and the authority to enact laws governing the land, (2) " 'the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government,' " (3) "whether there is 'an element of cohesiveness' " among the inhabitants, and (4) " 'whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples . . . .' " (Citations omitted.) Id., 839.

We note that, with regard to Indian tribes living in the eastern United States, there is virtually no history of a "relationship of the inhabitants of the area to Indian tribes and to the federal government" as required by the *South Dakota* test. See, e.g., *Bottomly* v. *Passamaquoddy Tribe,* 599 F.2d 1061, 1064 (1st Cir. 1979); *Joint Tribal Council of Passamaquoddy Tribe* v. *Morton,* 528 F.2d 370, 377 (1st Cir. 1975); *Narragansett Tribe* v. *Southern Rhode Island Land Development Corporation,* 418 F. Sup. 798, 804 (D.R.I. 1976). Thus, if the *South Dakota* test were applied indiscriminately to Eastern Indian tribes like the Schaghticoke, few if any of the tribes would qualify for federal recognition and its associated protections.

The *Dana* test, however, focuses on whether the Indians in question were a tribe in colonial times and whether they continue to function as a cohesive cultural unit. This test reflects more accurately the problems associated with Eastern Indian land and jurisdictional disputes. The Eastern Indians have, in many cases, faced pressures to assimilate for upwards of two centuries longer than western tribes. Therefore,

whether a tribe still exists as a culturally and politically distinct unit is a more important question in the context of Eastern Indian jurisdictional questions than whether the tribe was granted its reservation lands by a government that did not yet exist.

We note also that 18 U.S.C. § 1151 (b) is inherently ambiguous because it fails to define the term "dependent Indian community." Certain special principles of statutory construction apply to federal Indian law. "Ambiguities in statutes concerning dependent tribes are to be resolved in favor of the Indians. . . . State jurisdiction over reservations, historically, is strongly disfavored." (Citations omitted.) *Barona Group of Capitan Grande Band of Mission Indians* v. *Duffy,* 694 F.2d 1185, 1190 (9th Cir. 1982). Therefore, faced with two alternative standards defining "dependent Indian country," and in the absence of a definitive ruling from the United States Supreme Court, we choose to apply the *Dana* test because it more accurately addresses the problems associated with tribal identity in the context of the Eastern Indians and more completely satisfies those special rules of statutory construction that apply to Indian law.

In *State* v. *Dana,* supra, 562, the Supreme Court of Maine defined a *dependent Indian community* as "Indian country" if, (1) there is a bona fide tribe of Indians, and (2) the tribe has inhabited the land, has had "Indian title" to it since 1790,[6] and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose. We agree with the Appellate Court that the *Dana* test is the relevant standard.

---

[6] The federal Non-Intercourse Act, presently codified at 25 U.S.C. § 177, was passed in 1790 as a comprehensive measure regulating relations between the United States and the Indian tribes.

Application of the *Dana* test is dependent upon factual considerations about the tribe and the nature and character of its occupancy of its land. The trial court, assuming that federal law in all events applied and therefore that state action under General Statutes § 47-65 was preempted, did not address the *Dana* test and, as a result, made no factual determinations regarding the status of the Schaghticoke Indians. Our review of the record indicates that there is insufficient information available to determine whether the Schaghticoke Indians meet the requirements of the *Dana* test. As a result, we conclude that the trial court on remand must determine as a threshold matter: (1) whether the Schaghticoke Indians are a bona fide tribe for the purposes of federal law;[7] and (2) whether they have inhabited their reservation since 1790 and maintained the same nature of their occupancy since that time. *State* v. *Dana,* supra, 562–63. If the trial court finds that the Schaghticoke Indians are a "dependent Indian community" as that term is defined by the *Dana* test, then federal law directly applies and preempts independent state action. The state argues, however, that even if federal law applies the state still has civil jurisdiction over the Schaghticoke Indians either because the state has historically exercised such authority or because the state has validly assumed jurisdiction in compliance with federal law. The field of state civil jurisdiction over resident Indians is controlled by federal Public Law 83-280, passed in 1953 and codified at 18 U.S.C. § 1162 and 28 U.S.C. § 1360. "Nothing in the language or legislative history of Pub L 280 indi-

---

[7] See 25 C.F.R. 83.7; *United States* v. *Candelaria,* 271 U.S. 432, 442, 46 S. Ct. 561, 70 L. Ed. 1023 (1926); *Mashpee Tribe* v. *New Seabury Corporation,* 592 F.2d 575, 581–87 (1st Cir. 1979); *Joint Tribal Council of Passamaquoddy Tribe* v. *Morton,* 388 F. Sup. 649, 651–52 (D. Me. 1975); *State* v. *Dana,* 404 A.2d 551, 562–63 (Me. 1979).

cates that it was meant to divest States of preexisting and otherwise lawfully assumed jurisdiction." *Three Affiliated Tribes* v. *Wold Engineering,* 467 U.S. 138, 150, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984).

Public Law 83-280 granted to five states, not including Connecticut, civil jurisdiction over Indian tribes living within the state. Section 7 of the Act established a procedure by which other states could obtain civil jurisdiction over Indian tribes: "The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

In 1968, Congress passed the Indian Civil Rights Act[8] repealing § 7 of Public Law 83-280. Congress specifically provided that the repeal "shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal." 25 U.S.C. § 1323 (b). Thereafter, Connecticut could obtain jurisdiction over Indians living in the state only to the extent that either: (1) it had lawful jurisdiction prior to 1953; (2) it complied with the procedures outlined in the 1953 statute; or (3) it acquired jurisdiction with tribal consent after 1968. As to this last alternative, we agree with the trial court that there is no evidence that Connecticut has sought, or that since 1968 the Schaghticoke Indians have consented to, state jurisdiction.[9] Therefore, the issues are

---

[8] Public Law 90-284, 25 U.S.C. §§ 1321 through 1326.

[9] While it is true that the Schaghticoke Indians of Kent, Connecticut, Inc., sought out a state forum in this action, unilateral action of this sort is insufficient to constitute consent or otherwise give the state jurisdiction. See *Kennerly* v. *District Court of Montana,* 400 U.S. 423, 427, 91 S. Ct. 480, 27 L. Ed. 2d 507 (1971).

limited to: (1) whether Connecticut had lawful jurisdiction prior to 1953; or (2) whether Connecticut gained jurisdiction over the Schaghticoke Indians pursuant to federal law during the "window period" between 1953 and 1968.

The DEP first argues that, prior to 1953, the state exercised full jurisdiction over the Schaghticoke Indians and that "the 1968 amendments [to the federal laws] . . . did not displace jurisdiction . . . assumed prior to and apart from Pub. L. 280." *Three Affiliated Tribes* v. *Wold Engineering,* supra, 150–51. We see nothing in the enactments of the General Assembly to suggest that, prior to 1953, the state ever assumed full jurisdiction over disputes between the Schaghticoke Indians occurring on the Schaghticoke reservation.

Any early attempts by the colony of Connecticut to assume jurisdiction over the Schaghticoke Indians under the Fundamental Orders of 1639 were ended in 1662 by the charter of Charles II, the official royal grant of legislative authority to the colony. The United States Supreme Court examined this and other early state charters and concluded that these charters *implicitly respected Indian tribal sovereignty.* The court stated that the charters "were well understood to convey the title which, according to the common law of European sovereigns respecting America, they might rightfully convey, and no more. . . . The crown could not be understood to grant what the crown did not affect to claim." *Worcester* v. *Georgia,* 31 U.S. (6 Pet.) 515, 544–45, 8 L. Ed. 483 (1832). This title consisted only of "the exclusive right of purchasing such land as the natives were willing to sell." Id., 545. These charters therefore "could not affect the rights of those already in possession . . . ." Id., 544. Addressing specifically the Connecticut charter, the court stated that "[t]he charter to Connecticut concludes a general power to

make defensive war with these terms: 'and upon just causes to invade and destroy the natives or other enemies of the said colony.' . . . The very terms imply the existence of a country to be invaded, and of an enemy who has given just cause of war." Id., 545. The court concluded that, under the colonial charters, British policy "never intruded into the interior of [Indian] affairs, or interfered with their self-government . . . ." Id., 547. After the Revolution, the court found that "the treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states . . . ." Id., 557.

Connecticut statutory enactments thereafter reflected this policy of respecting Indian sovereignty. F. Cohen, Handbook of Federal Indian Law pp. 53–56. In 1717, the legislature enacted "An Act for well-ordering and governing the Indians in this State; and securing their Interest." This law provided, inter alia, that town selectmen "take Care that [local Indians] be well acquainted with the Laws of the State, made for punishing such Immoralities as they may be guilty of; and make them sensible that they are liable to the Penalties, in Case they transgress the Laws. . . ." General Statutes (1796 Rev.) p. 237, para. 1, cl. 1. This Act nowhere states that local officials had jurisdiction over Indian affairs between Indians occurring solely on Indian land. This statute, on its face, describes only colonial control over Indian misbehavior within the jurisdiction of the town selectmen. This conclusion is supported by clause 10 of the Act, which implicitly acknowledges Indian sovereignty by prohibiting individual land transactions with Indians and requiring land sales between Indians and European colonists to be approved by the state. See A. Vaughan, New England Frontier p. 116.[10]

[10] We note that some laws do seem to affect Indians living on reservations but that these laws appear to relate to specific military objectives.

Title 51 of the 1824 revision of the General Statutes is particularly telling in this regard. This law is the direct descendent of the 1717 law and is the predecessor of the present § 47-65. The statute authorizes the appointment of a commissioner of Indians. The responsibilities of this commissioner do not include punishment of civil violations but rather only the duty to maintain Indian lands. The statute nowhere suggests that state courts had jurisdiction over inter-Indian disputes and, in the footnote following the statute, explicitly adds that the Indians had never been "conquered . . . but . . . were . . . allies, and were considered as a free people." General Statutes (1824 Rev.) p. 234 n.1.

In sum, early Connecticut statutory enactments consistently, albeit implicitly, acknowledged Indian sovereignty. Thus the DEP is incorrect in arguing that Connecticut law prior to 1953 established jurisdiction over the Schaghticoke Indians.

It is possible, however, as previously noted, that state laws passed during the "window period" from 1953 to 1968 were sufficient to satisfy the requirements of § 7 of federal Public Law 83-280 and, as a result, caused a cession of jurisdiction to the state. The predecessor of General Statutes § 47-59 in effect in 1953 gave the welfare commissioner responsibility over the Schaghticoke Indians.[11] In 1961 the legislature added that "[a]ny person aggrieved by a decision of the welfare commissioner

---

For example, in 1704, the Connecticut General Assembly provided that, "for the incouragement of our forces . . . this Court will allow out of the publick treasurie the sume of five pounds for every mans scalp of the enemy killed in this Colonie. . . ." Conn. Records, IV, 464.

[11] General Statutes (1949 Rev.) § 7168 stated: "The commissioner of welfare is authorized to act as overseer of all tribes of Indians residing in the state . . . . Said commissioner, as such overseer, shall have the general care and management of the property of any Indian residing upon a reservation . . . ."

in regard to admission to or eviction from a[n Indian] reservation may appeal" to the state courts.[12] This statute is not a grant of general civil jurisdiction but only gives a right of appeal for a limited number of relatively minor concerns. At no time did any state law contain any reference to federal Public Law 83-280 nor did the state claim jurisdiction over inter-Indian disputes or Indian reservations pursuant to § 7 of Public Law 83-280.

We conclude therefore that Connecticut did not undertake to exercise sovereignty over the Schaghticoke reservation or over civil matters between Schaghticoke Indians during the interim period from 1953 to 1968 and that the state did not exercise civil jurisdiction prior to 1953. Thus, if the trial court determines that the Schaghticoke reservation constitutes "Indian country" for the purposes of federal law, state jurisdiction over the Schaghticoke tribe is preempted.

### Indian Tribal Sovereignty

If the trial court finds that the Schaghticoke reservation is not "Indian country" for purposes of federal law and therefore federal preemption precepts do not apply, it is still necessary to examine a second fact driven issue. Federal preemption is only one of the federal barriers to the state's acquisition of jurisdiction. "The exercise of state authority may also be barred by an independent barrier—inherent tribal sovereignty—if it 'unlawfully infringe[s] "on the right of reservation Indians to make their own laws and be ruled by them." ' *White Mountain Apache Tribe* v. *Bracker,* 448 U.S. 136, 142, 100 S. Ct. 2578, 2853, 65 L. Ed. 2d 665 (1980), quoting *Williams* v. *Lee,* 358 U.S. 217, 220, 79 S. Ct. 269, 270, 3 L. Ed. 2d 251 (1959)." *New Mexico* v. *Mescalero Apache Tribe,* 462 U.S. 324, 334 n.16, 103 S. Ct.

---

[12] Public Acts 1961, No. 304, § 4.

2378, 76 L. Ed. 2d 611 (1983); see also *Iowa Mutual Ins. Co.* v. *LaPlante,* 480 U.S. 9, 14, 107 S. Ct. 971, 94 L. Ed. 2d 10 (1987).[13]

"The concept that Indian tribes retain certain 'original natural rights,' defeasible only by the federal government and not by the several states, was first articulated . . . in *Worcester* v. *Georgia,* 31 U.S. (6 Pet.) 515, 559, L. Ed. 483 (1832)." *Penobscot Nation* v. *Stilphen,* 461 A.2d 478, 482 (Me. 1983). The United States Supreme Court stated that "[t]he treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union." *Worcester* v. *Georgia,* supra, 557. As a result the Indian tribes are considered " 'a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' " *McClanahan* v. *Arizona State Tax Commission,* 411 U.S. 164, 173, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973),

---

[13] Indian tribal sovereignty is "ultimately dependent on . . . the broad power of Congress." *White Mountain Apache Tribe* v. *Bracker,* 448 U.S. 136, 143, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980). "The sovereignty that the Indian Tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." *United States* v. *Wheeler,* 435 U.S. 313, 323, 98 S. Ct. 1079, 55 L. Ed. 2d 303 (1978).

The United States Supreme Court has stated that "our cases recognize that the Indian tribes have not given up their full sovereignty. We have recently said: 'Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . .' " Id., quoting *United States* v. *Mazurie,* 419 U.S. 544, 557, 95 S. Ct. 710, 42 L. Ed. 2d 706 (1975). The United States Supreme Court has been careful to note that the tribes do not retain full sovereignty but that they have " 'a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' " *McClanahan* v. *Arizona State Tax Commission,* 411 U.S. 164, 173, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973).

quoting *United States* v. *Kagama,* 118 U.S. 375, 381–82, 6 S. Ct. 1109, 30 L. Ed. 228 (1886). "Historically, Indian territories were generally deemed beyond the legislative and judicial jurisdiction of the state governments." *Three Affiliated Tribes* v. *Wold Engineering,* 476 U.S. 877, 879, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986).[14]

"The Supreme Court in time revised its view of the scope of an Indian nation's inherent powers." *Penobscot Nation* v. *Stilphen,* supra, 483. There has been a " ' "trend . . . away from the idea of inherent Indian sovereignty as a[n independent] bar to state jurisdiction and toward reliance on federal pre-emption." ' " *Three Affiliated Tribes* v. *Wold Engineering,* supra, 476 U.S. 884.[15] Even though the trend is toward federal preemption as the sole bar to state jurisdiction, the independent barrier provided by the doctrine of tribal sovereignty has not yet been abolished and therefore must be addressed. See *Oklahoma Tax Commission* v. *Citizen Band Potawatomi Indian Tribe of Oklahoma,* U.S. , 111 S. Ct. 905, 909, 112 L. Ed. 2d 1112 (1991); *Brendale* v. *Confederated Tribes & Bands of Yakima Indian Nation,* 492 U.S. 408, 425, 109 S. Ct. 2994, 106 L. Ed. 2d 342 (1989).

"The present right of tribes to govern their members and territories flows from a preexisting sovereignty limited, but not abolished, by their inclusion within the territorial bounds of the United States. Tribal powers of self-government . . . are observed and protected . . . to insure continued viability of Indian self-government *insofar as governing powers have not been limited or extinguished.* . . . The *exercise* of tribal governing power may itself preempt state law in areas where, *absent tribal legislation,* state law might otherwise apply." (Emphasis added.) F. Cohen, Handbook of Federal Indian Law p. 231.

---

[14] See F. Cohen, "The Spanish Origin of Indian Rights in the Law of the United States," 31 Geo. L.J. 1 (1942).

[15] See note, "In Defense of Tribal Sovereign Immunity," 95 Harv. L. Rev. 1058 (1982).

Thus, in order for a state enactment to impinge on tribal sovereignty, or in order for an Indian tribe to assert that it is not subject to civil jurisdiction that otherwise applies to state citizens, there must be a tribe that exists as a distinct cultural or ethnic group. Additionally, the tribe must have a form of demonstrable sovereignty or functioning self-government. Further, the state act in question must actually infringe on some exercise of tribal government or existing tribal legislation.

The state argues, and we agree, that there is no evidence that the Schaghticoke are a tribe or that they have any form of tribal self-government. The record is devoid of evidence as to whether the tribe is still, or has ever been, a cohesive cultural or ethnic unit. Furthermore, there is no evidence as to the existence, if any, of a tribal government or of an attempt by the Schaghticoke Indians, through tribal legislation or otherwise, to control the use of reservation lands in a way that would be inconsistent with the oversight of the DEP.

On remand, we therefore further direct the trial court to determine: (1) whether the Schaghticoke Indians are still a tribe; (2) whether they have in the past and presently continue to exercise some form of tribal sovereignty; and (3) whether the state act in question would unduly infringe on their sovereignty. In determining if the Schaghticoke are indeed a tribe, we direct the attention of the trial court to the definition of "Indian tribe" found in the federal regulations[16] and in such cases as *United States* v. *Candelaria*, 271 U.S. 432, 442, 46 S. Ct. 561, 70 L. Ed. 1023 (1926).[17] See

---

[16] 25 C.F.R. 83.7.

[17] " '[A] body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined, territory.' " *United States* v. *Candelaria*, 271 U.S. 432, 442, 46 S. Ct. 561, 70 L. Ed. 1023 (1926).

also *Mashpee Tribe* v. *New Seabury Corporation,* 592
F.2d 575, 581–88 (1st Cir. 1979). In regard to whether
the Schaghticoke retain any degree of actual sover-
eignty, we direct the trial court to determine if the tribe
maintains some form of practical tribal government,
such as a tribal council or a tribal court, that controls
the tribe's internal relations,[18] and whether the tribe
has enacted any legislation or regulations controlling
reservation lands. We recognize "that tribal sover-
eignty contains a 'significant geographical compo-
nent' "; *New Mexico* v. *Mescalero Apache Tribe,* 462
U.S. 324, 335 n.18, 103 S. Ct. 2378, 76 L. Ed. 2d 611
(1983); and that the traditional sovereignty interests
of the Indian tribes are strongest in cases, as here,
where the conduct involves only Indians on Indian
land.[19] Finally, the trial court must determine if DEP
regulation of reservation land under § 47-65 would
infringe on Indian sovereignty. We note that "[r]ecent
cases have confirmed . . . that an Indian tribe's inher-
ent powers cannot be judged in a vacuum, but must
be weighed against the interests of the state in apply-
ing its laws and regulations to the tribe." *Penobscot
Nation* v. *Stilphen,* supra, 483. Therefore, recognizing
that generally "[s]tate jurisdiction over reservations
. . . is strongly disfavored" and that "[a]mbiguities
in statutes . . . are to be resolved in favor of the
Indians"; *Barona Group of Capitan Grande Band of
Mission Indians* v. *Duffy,* 694 F.2d 1185, 1190 (9th Cir.
1982); the trial court must weigh the state's interests
in regulating reservation land against the potential
infringement on Indian sovereignty represented by
§ 47-65.

---

[18] Note discussion in *Mashpee Tribe* v. *New Seabury Corporation,* 592
F.2d 575, 581–87 (1st Cir. 1979).

[19] "When on-reservation conduct involving only Indians is at issue, state
law is generally inapplicable, for the State's regulatory interest is likely
to be minimal and the federal interest in encouraging tribal self-government
is at its strongest." *White Mountain Apache Tribe* v. *Bracker,* 448 U.S.
136, 144, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980).

We conclude that the record is insufficient to determine if the state is barred from assuming jurisdiction over the Schaghticoke Indians. We remand the case to the Superior Court with instructions that the court determine if the reservation is "Indian country" within the meaning of federal law and applying the test found in *State* v. *Dana.* If it is, then Connecticut does not have jurisdiction over the tribe and the DEP has no authority to intervene. If the trial court determines that the reservation is not "Indian country" then the trial court must decide whether the tribe still exists, whether it retains any elements of sovereignty and whether the authority granted the DEP under § 47-65 would infringe on existing tribal self-government.

The judgment is reversed and the case is remanded to the Appellate Court with direction to remand it to the trial court for further proceedings.

In this opinion the other justices concurred.

