[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISIONON MOTION TO DISMISS OF APRIL 25, 1995
CT Page 4270
The defendant has been charged with crimes in two separate informations. On a previous date, the defendant moved to dismiss those counts of both informations which allege the illegal sale of unstamped cigarettes. By memorandum of decision dated August 12, 1994, this motion was denied for the reasons stated [12 Conn. L. Rptr. 137]. On April 25, 1995, the defendant filed a second motion to dismiss. This motion raises the same basic claims as in the first motion. In the usual situation, the court would not consider a second motion addressing identical issues. Although it may be that the defendant's claims are actually matters in the nature of a special defense where he has contested subject matter jurisdiction, it is prudent to resolve the issue.
In support of the second motion, the defendant has introduced evidence in support of his claim that the state does not have the legal capacity to prosecute him on the charges enumerated in his motion. This was not done in connection with the first motion and is another reason to consider the second motion.
Under the circumstances of this case, then the second motion to dismiss will be considered. For reasons hereinafter stated, the motion must also be denied.
Before addressing the principal issues two preliminary matters must be addressed. The first matter involves an addendum to the state's brief in opposition to the motion of April 25, 1995. The second matter involves terminology used by the defendant.
On August 7, 1995, the state submitted a memorandum in reply to the defendant's memorandum in support of his motion to dismiss. Appended to the state's memorandum was a document entitled "Proposed Finding Golden Hill Paugussett Tribe" dated May 23, 1995. The document appears to have been prepared by the United States Department of the Interior Bureau of Indian Affairs Branch of Acknowledgment and Research.
By letter of September 18, 1995, the defendant strongly objected to the attachment of the report of May 23, 1995, to the state's brief and submitted letters from United States CT Page 4271 Senator Daniel K. Inouye contesting the report.
In the memorandum of decision of August 12, 1994, this court refused to consider documents attached to the defendant's memoranda of law. The reasoning behind that ruling applies to the documents in question here. The documents have no evidentiary value. They were not authenticated or introduced at the hearing in open court and, therefore, will not be considered.
The second preliminary issue involves terminology used by the defendant.
In previous papers filed with the court, the defendant made reference to the Golden Hill Paugussett Nation or the Golden Hill Paugussett Tribe. When referring to the tribe in which the defendant claimed membership, all parties used the term Golden Hill Paugussett. In the memorandum of decision of August 12, 1994, the court took judicial notice of General Statutes Chapter 824 which mentions the Golden Hill Paugussetts and recognizes that entity as an indigenous self-governing tribe of Indians with certain powers as set forth in the statutes.
The defendant's motion to dismiss dated April 25, 1995, and the memorandum of law filed in support of the motion refers throughout to the Golden Hill "Paugeesukq" Tribe. Chapter 824 makes no reference to any such Tribe. There is no legally established entity by that name.
For purposes of this decision then, it will be assumed that where the defendant uses the term Golden Hill Paugeesukq, he is making reference to the state recognized Golden Hill Paugussett Tribe.
Although its motion to dismiss claims to present four issues, the first two must be considered together. The defendant has, therefore, presented three separate claims of law in support of his position that the court lacks subject matter jurisdiction to prosecute him for the sale of unstamped cigarettes. The three issues are:
 I. The defendant is an Indian, a member of the Golden Hill Paugussett Tribe, and the alleged criminal acts occurred in Indian Country. CT Page 4272
 II. The exercise of state jurisdiction is barred by Indian tribal sovereignty.
 III. The alleged acts detailed in the February 10, 1994 information were tribally and statutorily sanctioned.
 I
It is defendant's claim that he is an Indian and that the criminal acts alleged in the information occurred in "Indian Country." Thus, the defendant asserts that the state is barred by federal law from exercising criminal jurisdiction over such acts. The defendant argues, without conceding, that even if the state has the right to enforce the collection of its cigarette taxes as claimed, it cannot do so by criminal prosecution.
The federal statute, which the defendant relies on with this claim, is 18 U.S.C. § 1151(a) and (c). This statute defines "Indian Country." Section 18 U.S.C. § 1152 provides that "[e]xcept as otherwise expressly provided by law, the general law of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to Indian Country." As a general principal, federal jurisdiction is preeminent for Indians in "Indian Country."
Assuming federal preemption, the questions presented are: a) Is the defendant an Indian so as to place him under federal law?, and, b) Did the alleged crimes occur in "Indian Country?"
The defendant introduced evidence in support of his claim that he is an Indian. Such evidence establishes that he is an Indian under the laws of the State of Connecticut.
Under the provisions of General Statutes § 47-63 "`Indian' means a person who is a member of any of the following tribes . . . Golden Hill Paugussett." The defendant claims to be a member of the Golden Hill Paugussetts, a tribe recognized as an indigenous tribe of the State of Connecticut. General Statutes § 47-59a(b). CT Page 4273
Although the authority of the court to determine tribal membership is limited by the provisions of § 47-59a(b) and §47-66j(b), the court has the power to determine issues concerning its jurisdiction. Golden Hill Paugussett Tribe of Indians v.Southbury, 231 Conn. 563, 570, 651 A.2d 1246 (1995). Without impinging on statutory tribal authority or violating the spirit of the law, the court can determine whether or not the defendant is recognized by the Golden Hill Paugussetts as a member of their tribe.
The defendant introduced considerable evidence tending to prove that he has been recognized as a member of the Golden Hill Paugussett Tribe.
Michael Smith, an officer and member of the tribe, and Michael S. Haney, executive director of the American Arbitration Institute offered evidence to the effect that the defendant had always been a recognized member of the tribe. The testimony of Mr. Sarabia, Indian Affairs Coordinator for the State Department of Environmental Protection, also supported the defendant's claim of tribal membership.
Certain exhibits, including the tribal membership list of June 30, 1993, which lists the defendant, Kenneth Piper, as a member of the tribe, also tend to support a conclusion that the defendant was a recognized member of the tribe.
A tribal resolution adopted on January 21, 1995, acknowledging the defendant as a member of the Golden Hill Paugussett tribe was also introduced into evidence.
There was some discussion to the effect that the defendant's membership in the tribe had been terminated and that he had been banished. Irrespective of whether banishment was a procedure recognized by the tribe, there was little evidence that the defendant's tribal membership had been terminated or that he had actually been banished.
It must then be found that at all times pertinent to the issues of this case, the defendant was a bona fide member of the Golden Hill Paugussett Tribe and, therefore, under the provisions of General Statutes § 47-63, is an Indian under the laws of the State of Connecticut. CT Page 4274
Defendant also claims that it has been established that he is an Indian under the two part test as enunciated in U.S.v. Driver, 755 F. Sup. 885 (D.S.D., 1992).
The first part of the Driver test is whether the person has some Indian blood. The second part of the test looks to whether the person is recognized as an Indian. The most important factor is whether the person is enrolled in a tribe. Other factors include whether the federal government has, either formally or informally provided the person with assistance reserved only to Indians; whether the person enjoys the benefits of tribal affiliation and whether he is socially recognized as an Indian because he lives on the reservation and participates in Indian social life. U.S. v. Driver,
supra, 755 F. Sup. 888. See also, St. Cloud v. U.S.,702 F. Sup. 1456 (D.S.D. 1988).
It must be concluded that with one important caveat that the defendant has substantially established his Indian status under the Driver test. The evidence indicates that the defendant has Indian blood. His father is the hereditary chief of the Golden Hill Paugussett tribe. The defendant is enrolled in the tribe. The evidence also establishes that the defendant enjoys the benefits of tribal affiliation and is socially recognized as a member of the tribe. At all times material he lived on the Golden Hill Paugussett reservation and participated in tribal social life.
The evidence that the defendant has received assistance reserved only for Indians is not persuasive. There is nothing to indicate that the defendant personally received direct assistance from the federal government under any program designed to assist Indians. For an example of the type of direct assistance contemplated under Driver, see St. Cloud v.U.S., supra, 702 F. Sup. 1416.
Although proof of this one criteria under the Driver test might not in itself be fatal, it is significant here.
Even under the Driver test, the defendant's Indian status related back to General Statutes Chapter 824 and, in particular, § 47-63 and § 47-59. His Indian blood is that of a state recognized tribe. He is enrolled only in a state recognized tribe and his affiliation and recognition are only with that tribe. There is nothing to indicate that the CT Page 4275 defendant or the Golden Hill Paugussett tribe has ever been recognized by the federal government as an Indian tribe.
While it must be concluded that under the laws of this state and using the Driver test, the defendant was an Indian at the time of the alleged crimes, he was only recognized as such by the state. There is nothing to indicate that he enjoyed the protection of the federal government as an Indian.
A person whose only claim of Indian status rests on membership in an Indian group not recognized as a federally acknowledged Indian tribe cannot be an Indian for federal criminal jurisdiction purposes. La Pier v. McCormick,986 F.2d 303, 305 (9th Cir. 1993).
"In dealing with Indians, the federal government is dealing primarily not with a particular race as such, but with members of certain social-political groups towards which the federal government has assumed special responsibility." Id. The federal government has assumed no such special responsibility with the tribe that the defendant has membership in.
The State of Connecticut, under General Statutes Chapter 824, has assumed a special responsibility for the Golden Hill Paugussett Tribe. The defendant's status as a Connecticut Indian, however, does not place him under the protection of the federal statutes relied upon, or deprive the state of jurisdiction in this case.
The information alleged that the criminal acts for which defendant stands charged all took place in the Town of Colchester. The state has stipulated that it is claiming the crimes occurred on the Golden Hill Paugussett Reservation in that town. General Statutes § 47-63 recognizes the reservation in the Town of Colchester as a reservation of the Golden Hill Paugussett tribe.
Is this reservation "Indian Country" under federal law? An understanding as to how the tribe acquired the land designated as a reservation is essential to a resolution of this question.
The evidence indicates that by warranty deed dated June 13, 1979, Riccardo Taddei conveyed to a corporation entitled CT Page 4276 Golden Hill Development Corporation for a consideration of $69,000.00 six parcels of land in the Town of Colchester. The property consisted of lots 42, 43, 44, 45, 47 and 48 on a map entitled "Property of Lane Realty Company . . . Revised March, 1955 . . ." The property was acquired subject to building, building lines and zoning regulations of the Town of Colchester, and was subject to taxes due the Town of Colchester on the list of October 1, 1978, which taxes the corporation assumed and agreed to pay.
By warranty deed dated February 13, 1980, the same corporation acquired another parcel of land in the Town of Colchester from Mary Krop for a consideration of $45,000.00. The conveyance was made subject to unrecorded and inchoate mechanic liens, building lines, zoning regulations and taxes as in the deed from Taddei. A question concerning a right of way was also noted in the deed.
There was testimony that the corporation acquired the land by virtue of a HUD grant designed to aid Indians.
By quit claim deed, without consideration, dated January 30, 1981, Golden Hill Development Corporation conveyed to "Golden Hill Paugussett tribe, a tribe and/or band of native Americans who maintain business offices at 427 Shelton Road, Trumbull, Connecticut" its interest in the land acquired from Krop and Taddei. The real property acquired by the tribe by virtue of the quit claim deed of January 30, 1981 constitutes the Colchester Reservation.
It would appear then that the reservation consists of two parcels of land both laid out for development and subject to liens, building lines and zoning regulations. This land was acquired by the Tribe in 1981, and is claimed to be Indian Country under federal law.
Indian Country was defined in 18 U.S.C. § 1151 enacted by Congress in 1948.
§ 1151. Indian country defined
 Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian Country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the CT Page 4277 jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
In Schaghticoke Indians of Kent, Connecticut, Inc. v.Potter, 217 Conn. 612, 618-20, 587 A.2d 139 (1991) the court was faced with the question as to whether or not the Connecticut reservation of a non-federally recognized tribe could be considered Indian Country under 18 U.S.C. § 1151. The court proceeded to consider the determination under subsection (b) raising the issue as to whether the group of Indians in question constituted a dependent Indian community for the purposes of federal law. After considering various tests, the court concluded that the appropriate test for Eastern tribes such as the Schaghticokes would be the test set out in Statev. Dana, 404 A.2d 551 (Me. 1979), cert. denied, 444 U.S. 1098,100 S.Ct. 1064, 62 L.Ed.2d 785 (1980).
The Dana test focuses on whether the Indians in question were a tribe in colonial times and whether they continued to function as a cohesive cultural unit. The test reflects more accurately the problems associated with Eastern Indian land and jurisdictional disputes. Schaghticoke, supra, 217 Conn. 619.
Under the Dana test a dependent Indian Community could be considered "Indian Country" if:
(1) There is a bona fide tribe of Indians, and
 (2) The tribe has inhabited the land, has had "Indian title" to it since 1790 and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose.
 Schaghticoke, supra, 217 Conn. 620.
Obviously the Golden Hill Paugussett reservation in Colchester, having been acquired in 1981, cannot be found to be Indian Country using the Dana test. CT Page 4278
Defendant admits that the Colchester reservation cannot meet the standard of the Dana test, but he argues that the reservation could be found to be "Indian Country" under subsection (a) or (c) of § 1151.
It is significant to note that the Supreme Court inSchaghticoke when confronted with a jurisdictional question concerning "Indian Country" did not consider subsection (a) or (c) but concentrated on subsection (b). On remand, the Supreme Court directed the trial court to determine if the reservation in question was "Indian Country" under federal law applying the Dana test. Schaghticoke, supra, 217 Conn. 681. The court did not even consider subsection (a) and (c). If those subsections of § 1151 were applicable, certainly the court would have included them in the remand order.
Despite the obvious position of the Supreme Court inSchaghticoke, the defendant claims that subsection (a) is applicable. Subsection (a) defines "Indian Country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . ." In this case, the reservation is state sanctioned and recognized, not federally recognized as an Indian reservation. The reservation has been recognized as such only by state statute. The clause "under the jurisdiction of the United States Government" as used in the statute originally came from a 1932 amendment to the Indian Major Crimes Act and was possibly added to exclude from the scope of the statute Indian reservations governed by certain states and thus not under federal protection." F. Cohen, Handbook of Federal IndianLaw, (1982 Ed.) Chapter 1, Sec. D.
The defendant argues that the Colchester reservation complies with the requirements of subsection (a) since the land was acquired under the federal grant by a development corporation and subsequently quit claimed to the tribe. There is, however, nothing to indicate that the land in Colchester once acquired by the tribe came under the jurisdiction of the United States Government.
In support of his argument that the reservation should be considered "Indian Country" under subsection (a), the defendant quotes certain language from cases which he claims support his position. A review of the cases, however, CT Page 4279 indicates that they are inapplicable.
For example, Pronovost v. U.S., 232 U.S. 487,34 S.Ct. 391 (1913) does use the language "an Indian reservation is Indian Country" quoting from Clairmont v. U.S., 225 U.S. 551,32 S.Ct. 787, 56 L.Ed. 1201 (1912). Both of these cases, however, deal with the introduction of liquor, in violation of federal law, on to a reservation established by treaty with the Indian and the federal government in 1855. Donnelly v.United States, 228 U.S. 243, 33 S.Ct. 449 (1912) involves the limits of a federal reservation established in 1876. U.S. v.John, 437 U.S. 634, 98 S.Ct. 2541 (1978) is also relied upon by defendant. John involved a state/federal dispute over territory inhabited by remnants of the Choctaw tribe. The land in question was not recognized as a reservation by any specific federal statute, but had been occupied by the tribe prior to the Revolutionary War. By treaty, the tribe relinquished claims to the land and was removed to the West in 1830. The U.S. Supreme Court held that the land still occupied by the remnants of the tribe who had avoided removal was Indian Country. This is consistent with the reasoning of the Maine court in Dana. It is clearly not applicable to the Colchester reservation.
Defendant has also found language in Young Bear v.Brewer, 415 F. Sup. 807 (N.D. Iowa 1976) which he claims supports his position. In this case the court did say that "the determination of whether lands constitutes `Indian Country' does not turn on the label used in designating them,United States v. McGowen, 302 U.S. 535, 58 S.Ct. 286,82 L.Ed. 410 (1938), nor on the manner in which the lands in question were acquired. Seymour v. Superintendent, 368 U.S. 351,82 S.Ct. 424, 7 L.Ed.2d 346 (1962); United States v.Martine, 442 F.2d 1022, 1023 (10th Cir. 1971). Rather the test is whether such lands have been set apart for use, occupancy and protection of defendant Indian people." YoungBear, supra, 415 F. Sup. 809. Although this language is used in Young Bear, it must be kept in context. In that case, the land in question was admitted by all to be a federal Indian reservation. The only issue was whether other legislation had given the state jurisdiction on the reservation. UnitedStates v. McGowen, 302 U.S. 535, 53 S.Ct. 286 (1937) quoted in Young Bear dealt with a situation where the federal government, in 1916, acquired land for needy Indians. The land was under the direct supervision and control of the CT Page 4280 Department of the Interior. The Indians were afforded the same protection as those in settlements known as "reservations" but the area was labeled a "Colony." Relying on the language quoted in Young Bear, the court concluded that there was no distinction between the Indian "Colony" and "Indian Country."
The language and the reasoning in Young Bear and McGowen
make sense in the context of those cases but has no application to the Colchester reservation.
It is also claimed by the defendant that 18 U.S.C. § 1151(c) is also applicable to the Colchester reservation. The term "Indian Allotment" used in subsection (c) refers to land owned by individual Indians and either held in trust by the United States or subject to statutory restrictions on alienation. The allotments were for the most part carved out of tribal lands and allotted to individual Indians under a federal policy of assimilating Indians by making them into individualized farmers and stockmen. This policy prevailed between 1854 and 1934. Handbook of Federal Indian Law, supra p. 40. The Colchester reservation does not fit within the definition of an "Indian Allotment."
It must then be concluded that there is no legal basis for determining that the Colchester reservation is "Indian Country" under 18 U.S.C. § 1151(a) (c). Since the reservation cannot be considered a dependent Indian community under subsection (b) using the Dana test, it must further be concluded that the reservation is not "Indian Country," and the State of Connecticut has not been preempted by the federal government from exercising criminal jurisdiction over the defendant, recognized by the state as an Indian, for criminal acts committed on the state reservation of the Golden Hill Paugussetts in Colchester.
 II
Defendant claims that the state's exercise of criminal jurisdiction is barred by Indian tribal sovereignty.
It is defendant's claim that the state lacks jurisdiction in this matter because of the inherent sovereignty of the Golden Hill Paugussett tribe. As the defendant correctly points out, the concept of Indian tribal sovereignty was first CT Page 4281 articulated by Chief Justice Marshall in Worcester v. Georgia,31 U.S. 515, 559 L.Ed 483 (1832).
The issue in Worcester was whether or not the state legislature could assert jurisdiction over the internal affairs of the Cherokee tribe. After an extensive review of the subject from Colonial times to and after the Revolution and the establishment of the United States, the court found the Georgia legislation to be void as it impinged upon the tribe's inherent right of self-government.
The concept of "Indian Tribal Sovereignty" was also addressed in Schaghticoke. There the court approved the concept set forth in White Mountain Apache Tribe v. Brochen,448 U.S. 136, 142, 100 S.Ct. 2578, 2853, 65 L.Ed.2d 665
(1980) that "(t)he exercise of state authority may also be barred by an independent barrier — inherent tribal sovereignty — if it unlawfully infringe(s) on the right of reservation Indians to make their own laws and be ruled by them."
General Statutes Chapter 824 also authorizes indigenous Indian tribes such as the Golden Hill Paugussetts to regulate their own intra tribal affairs.
Defendant's reliance on the above quoted case as a jurisdictional bar to this prosecution is, however, misplaced.
Schaghticoke was a civil action arising out of an internal tribal dispute. The case at bar is quite different. This case involves prosecution for violation of a state law.
The matters at issue here do not involve any right inherent or statutory of the Golden Hill Paugussett tribe to govern themselves.
Defendant also argues that State v. Spears, 234 Conn. 78,662 A.2d 80 (1995) supports his position here. Such is not the case. Spears dealt only with the extent of criminal jurisdiction granted by Congress to the State of Connecticut under the provisions of the Connecticut Indian Land Claims Settlement Act of 1983. Tribal sovereignty was not an issue in that case.
There is no jurisdictional impediment to prosecution of this case due to Indian sovereignty. CT Page 4282
 III
Defendant claims that the acts for which he is being prosecuted were sanctioned by the tribe and authorized by statute and, therefore, he cannot be prosecuted for them.
The evidence supports defendant's claim that a "Smoke Shop Resolution" was passed by the Tribal Government Committee with the endorsement of the General Tribal Council. Pursuant to the resolution, a tribally run smoke shop was set up and operating on the Colchester reservation. For the purposes of this motion it is assumed that defendant conducted the smoke shop operation in violation of the statutes as set forth in the information. It is defendant's position that the state cannot prosecute him since he was conducting a sanctioned tribal business authorized by law. In this position, defendant relies on the provisions of General Statutes §47-59a.
There is no dispute that the Golden Hill Paugussett tribe is statutorily recognized by the state as a "self governing entit[y] possessing powers and duties over tribal members and reservations." General Statutes § 47-59a(b). Among the powers specifically granted to the tribe are the rights to "regulate trade and commerce on the reservation and make contracts."
The defendant, relying specifically on the power of the tribe to "regulate trade and commerce on the reservation" alleges that the power is plenary, and insulates the tribe from cigarette the taxing scheme set forth at General Statutes § 12-285 et seq.
As previously noted, General Statutes § 47-59a(b)(3) specifically gives the tribe the power and authority to regulate trade and commerce on the reservation. The statute, however, nowhere defines the phrase "trade and commerce." It is, however, a cardinal rule of statutory construction that "[w]hen the words of a statute are plain and unambiguous, we look no further for interpretive guidance because we assume that the words themselves express the intention of the legislature." Caltabiano v. Planning Zoning Commission,211 Conn. 662, 666, 560 A.2d 975 (1989). Words and phrases of a statute also must be given their plain and ordinary meaning. CT Page 4283
Black's Law Dictionary (6th Ed. 1990) defines `commerce' as "[t]he exchange of goods, productions or property of any kind; the buying, selling and exchanging of articles." Additionally, `trade' is defined as "[t]he act or the business of buying and selling for money; traffic; barter." Construing the terms of the statute, it is evident that the power granted to "regulate trade and commerce" encompasses the authority to buy, sell or barter cigarettes on the reservation.
Having come to this conclusion, the question is whether the statute is so broad and encompassing as to allow the defendant to sell cigarettes without collecting the state's tax. At the outset, the court is guided by the principle that:
 [f]irst, statutes that provide exemptions from taxation are a matter of legislative grace that must be strictly construed against the taxpayer. Second, any ambiguity in the statutory formulation of an exemption must be resolved against the taxpayer. . . .
 Plastic Tooling Aids Laboratory, Inc. v. Commissioner,213 Conn. 365, 369, 567 A.2d 1218 (1990).
There is nothing in the language of General Statutes §47-59a which suggests that the statute allows the Golden Hill Paugussett tribe, or any other tribe mentioned within its text, to sell cigarettes on any state created reservation without collecting a cigarette tax. In fact, when the legislature specifically wanted to exempt state recognized tribes from certain fees and taxes, they used specific and uncontroverted language to do so. For instance, General Statutes § 12-19a(a) provides for a state payment in lieu of property taxes to those towns "wherein state-owned real property or reservation land [is] held in trust by the state for an Indian tribe." Such a payment is necessary because "property belonging to, or held in trust for, this state and reservation land held in trust by the state for an Indian tribe," is specifically exempt from taxation under General Statutes § 12-81(2). Also exempt from taxation is "any motor vehicle owned by a member of an indigenous Indian tribe or spouse and garaged on the reservation of the tribe." General Statutes § 12-81(71). Because no explicit language exists exempting the tribes from the state's valid exercise of its CT Page 4284 taxing authority in either the statutes concerned with cigarette taxation, or in the statutes specifically recognizing certain state indigenous tribes, then it must be concluded that no such exemption exists.
Prosecution for the sale of untaxed cigarettes in violation of state laws at a Smoke Shop on an Indian reservation has been upheld in other jurisdictions. In Kansasv. Oyler, 803 P.2d 581 (Kan.Ct.App. 1990) where the underlying factual situation was similar to this case, it was held that the state could enforce its tax laws by criminal prosecution against an Indian on an Indian allotment.
In Moe v. Confederated Salish Koatemi Tribes, Inc.,425 U.S. 634, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) an Indian who operated a smoke shop on reservation land brought an action for declaratory judgment and injunctive relief against the state of Montana after his arrest for violation of the cigarette tax laws of that state. In denying the relief sought, the court held that the state may require Indian proprietors of reservation smoke shops to collect a tax on sales to non Indians.
It must then be concluded that even if the tribe had authority under General Statutes § 47-59a to operate a smoke shop for the sale of cigarettes on the Colchester reservation such sales would be subject to the licensing and tax laws of the state of Connecticut and anyone selling cigarettes in violation of the tax laws could be prosecuted.
For all of the reasons above-stated, it must be found that the court has criminal jurisdiction in this matter and the motion to dismiss must be denied.
Accordingly, the motion to dismiss is denied.